NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 09a0261n.06

Filed: April 3, 2009

No. 08-3632

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| ERIC KIPSANG ATUGAH, | ) | |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE BOARD OF |
| | ) | IMMIGRATION APPEALS |
| ERIC H. HOLDER, JR., ATTORNEY | ) | |
| GENERAL, | ) | |
| | ) | |
| Respondent-Appellee. | ) | |
| | ) | |
| | ) | |

Before: CLAY and GIBBONS, Circuit Judges; and GREER, District Judge.[*]

**JULIA SMITH GIBBONS, Circuit Judge**. Eric Kipsang Atugah ("Atugah") appeals the

denial of his application for withholding of removal pursuant to section 241(b)(3)(B) of the

Immigration and Nationality Act ("Act"), 8 U.S.C. § 1231(b)(3), and the United Nations Convention

Against Torture ("CAT"). The Immigration Judge ("IJ") denied Atugah relief, finding that Atugah

was not credible and had neither demonstrated a clear probability of persecution nor showed that he

would more likely than not be tortured upon return to Kenya. The Board of Immigration Appeals

("BIA") affirmed the decision of the IJ. Atugah contends that the IJ erred in finding him not

credible, determining that he neither suffered past persecution nor had a well-founded fear of future

persecution, and finding him ineligible for relief under the Act or the CAT.

---

[*] The Honorable J. Ronnie Greer, United States District Judge for the Eastern District of
Tennessee, sitting by designation.

Because the evidence in the administrative record does not compel a conclusion contrary to the IJ's decision, we affirm the judgment of the IJ.

## I.

Petitioner Atugah, a native and citizen of Kenya, entered the United States lawfully in Detroit, Michigan on December 8, 2000, on an F-1 student visa to attend Northwestern Michigan College in Traverse City, Michigan. Atugah stopped attending college in the summer of 2002. The Immigration and Naturalization Service, now the Department of Homeland Security, consequently found Atugah subject to removal and ordered him to appear before an IJ to show cause why he should not be removed from the United States. On September 26, 2007, Atugah appeared before an IJ and conceded removability. The IJ designated Kenya as the country of removal. Atugah conceded that he was statutorily ineligible for asylum because he had not applied within one year of arrival, but he indicated his desire to apply for withholding of removal under the Act and the CAT. Atugah had married a United States citizen in 2002, but the IJ found him ineligible to adjust status because although he had applied for legal status through his spouse, his application had not yet been approved at the time of his removal hearing.

Atugah submitted an application for withholding of removal under the Act based on alleged persecution on account of his political opinion and membership in a particular social group. He also applied for relief under the CAT, claiming that he feared torture upon return to Kenya because of his family's involvement with politics and on the alleged basis that three of his cousins had been killed for political reasons.

Atugah defended his application at an individual hearing on the merits via video conference on December 12, 2007. Before the hearing began, he was given an opportunity to amend his application. He and his counsel made six amendments, and when Atugah still expressed hesitation about the contents of the application, the IJ had a copy faxed to him. After reviewing the application again, Atugah answered in the affirmative that the application was true and complete.

Atugah testified that he is from the village of Nandi and a member of the Nandi tribe. He and his family members belonged to the Kenyan African National Union ("Kanu") political party. Atugah's uncle, Simon Kiptung Choge ("Choge"), was active in the Kanu political party. First Choge served as a member of parliament. When Choge lost his parliament seat in 1976, he worked as chairman of the Kanu party for the Nandi district from 1976 until 1992. In 1992, Choge regained his parliament seat and served until 1997 or 1998. Around 1997, Choge was appointed assistant minister to the office of the president and served former President Daniel Arap Moi.

According to Atugah, Choge had five biological children (Ebraheme, Jimmy, Daniel, James, and Lena) and one stepson (Kipsase). Several of Choge's children were active in politics. Choge's son–and Atugah's cousin–Jimmy Choge was elected to parliament in 2002 and served until he had a stroke a few months before Atugah's hearing. Choge's son Ebraheme also served in parliament and married President Moi's daughter, Doris.

Atugah testified that Ebraheme was killed in 1998 in a car accident. Based on eye-witnesses and his own assessment of the scene, particularly the pattern of black tire marks he saw, Atugah believes that the accident was planned and that Ebraheme was forced off of the road by two trucks in retaliation for the fact that Ebraheme's father Choge (Atugah's uncle) had an affair with the

3

former president's wife in 1976. After the affair, the former president divorced his wife, and according to Atugah, there has been conflict between his family and the former president's family ever since. Atugah also testified that the former president's family wished to take control of Choge's corn fields, which were the largest in Kenya.

After Ebraheme's death in 1998, Ebraheme's sister Lena was found stabbed to death in 1999. The police allegedly said that it was a planned crime and not random violence. Another cousin, Richard Kiptung, was also later murdered. In sum, Atugah claims that three of his cousins were killed because of the conflict between the former president and Choge.

Atugah allegedly fears returning to Kenya because he is afraid that he will also be targeted by the former president's family, particularly because his association with Ebraheme was well-known. Before Ebraheme died, Atugah was allegedly beaten three times. The first time he was stopped by three men, who asked him when Ebraheme was coming home and beat him. The second time, two men accosted him from an alleyway and beat him with copper wire. He still has a scar from this attack. The third time, he was waiting at a bus stop when a group of people approached him, asked him where Ebraheme and Choge were, beat him, and took his money.

Atugah also testified that during his adult circumcision ceremony in the jungle, unknown men beat him for one day and one night, did not give him pain killers during the actual circumcision, and placed a special mark on his genitalia because of his association with Ebraheme. He was allegedly given a special mark during his adult circumcision on his genitals to help people recognize him as a targeted man during future rituals: "[T]hey can check you and if they can decide they know, it's, there's a mark on you and somebody is looking for you." (Hearing Tr. at 95.)

4

The IJ found Atugah not credible on the basis that he had failed to mention any of the three beatings or his circumcision experience on his application. Atugah responded that he had not listed that information because his attorney had advised him to be brief. Emphasizing the amount of time the IJ took before the hearing to ensure that Atugah was satisfied with his application, the IJ did not find "the respondent's explanation for these key omissions to be convincing." (Oral Decision and Order at 16-17.) The IJ found that even if it were to consider the merits of Atugah's claims, Atugah had not established his eligibility for withholding of removal under the Act or the CAT. The IJ determined that Atugah could avoid future persecution by relocating to another part of Kenya. Furthermore, the IJ found that even if Atugah could establish a well-founded fear of persecution, any persecution would be based on personal animosity, not on Atugah's political opinion or membership in a particular social group.

Atugah appealed the decision of the IJ to the BIA. The BIA adopted the reasoning of the IJ and affirmed the denial of Atugah's application. Atugah timely appealed to this court. Atugah filed a motion for stay of removal, which was granted by this court on July 29, 2008.

**II.**

Appellate courts generally review the BIA's opinion rather than the opinion of the IJ. *See Koulibaly v. Mukasey*, 541 F.3d 613, 619 (6th Cir. 2008). Here, however, "[w]here the BIA adopts the IJ's reasoning, the court reviews the IJ's decision directly to determine whether the decision of the BIA should be upheld on appeal." *Gilaj v. Gonzales*, 408 F.3d 275, 282-83 (6th Cir. 2005). Administrative findings of fact as to the eligibility of petitioners for withholding of removal under the Act or the CAT are reviewed under the deferential substantial evidence standard. *See Koulibaly*,

5

541 F.3d at 618; *Ndrecaj v. Mukasey*, 522 F.3d 667, 676 (6th Cir. 2008). "[T]o overturn such a factual determination, 'we must find that the evidence not only *supports* [a contrary] conclusion, but *compels* it.'" *Kaba v. Mukasey*, 546 F.3d 741, 747 (6th Cir. 2008) (alterations in original) (quoting *INS v. Elias-Zacarias*, 502 U.S. 478, 481 n.1 (1992)).

### III.

#### A.    The IJ's Credibility Finding

"[T]here is no presumption of credibility," and the petitioner bears the burden of proof to show that he has a credible claim. 8 U.S.C. § 1158(b)(1)(B)(i), (iii). An IJ should look to the following to make a credibility determination:

> Considering the totality of the circumstances, and all relevant factors, a trier of fact may base a credibility determination on the demeanor, candor, or responsiveness of the applicant or witness, the inherent plausibility of the applicant's or witness's account, the consistency between the applicant's or witness's written and oral statements (whenever made and whether or not under oath, and considering the circumstances under which the statements were made), the internal consistency of each such statement, the consistency of such statements with other evidence of record (including the reports of the Department of State on country conditions), and any inaccuracies or falsehoods in such statements, without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim, or any other relevant factor.

8 U.S.C. § 1158(b)(1)(B)(iii); *Shan Sheng Zhao v. Mukasey*, 553 F.3d 436, 444 (6th Cir. 2009) (applying this statutory language to assess credibility of claims of withholding under the Act and the CAT). However, "[i]f discrepancies 'cannot be viewed as attempts by the applicant to enhance his claims of persecution, they have no bearing on credibility.'" *Koulibaly*, 541 F.3d at 620 (alterations in original) (quoting *Sylla v. INS*, 388 F.3d 924, 926 (6th Cir. 2004)).

6

The IJ determined that Atugah was not credible because he omitted any description of the beatings and his circumcision from his application for withholding of removal, failed to explain these omissions convincingly, and lacked corroborative evidence of his claims. Atugah argues that the IJ erred by focusing on the omissions in his testimony and that he did not include those events because his counsel ordered him to be "brief" on the application. Atugah is correct that the fact that he did not mention his beatings or unusual circumcision in his application does not necessarily make his story inconsistent. Indeed, those experiences could be seen as details consistent with his general claim that his family is being persecuted because of their association with his uncle Choge and his cousin Ebraheme. *See Kaba*, 546 F.3d at 749 ("[T]he mere failure of a petitioner to include every detail . . . in the application itself should not be considered fatal to a petitioner's request for relief.").

Nevertheless, Atugah's omissions are particularly significant in this case because the beatings and unusual circumcision are the only instances of physical harm and personal threats against Atugah himself. Atugah's application claims that his family has suffered harm, namely the deaths of his three cousins. Atugah did not mention any threats against himself on direct examination; rather only on cross-examination and re-direct did he describe any harm he suffered personally. Atugah's failure to list these experiences on his application, despite making other changes and being given additional time to review his application, is somewhat peculiar as they constitute the basis of his claim for withholding of removal under the Act and CAT. The IJ also noted that Atugah lacked any corroborating evidence, even though he is in contact with his family in Kenya and could reasonably obtain documentation. Atugah's failure to list his personal injuries coupled with his lack of any

7

documentation provide substantial evidence to support the IJ's determination that he was not credible.

Atugah further contends that the use of video conferencing during his hearing impaired the IJ's ability to observe him and determine his credibility. The fact that Atugah participated by video conference, however, did not affect what he wrote down on his application, which he submitted before the hearing. Nevertheless, Atugah argues that participation by video conference deprived him of effective interaction with his attorney and precluded his asking her whether he should have amended his application to include descriptions of the beatings and circumcision.

This allegation fails for two reasons. First, video conference is expressly authorized by statute. 8 U.S.C. § 1229a(b)(2)(A)(iii) ("The proceedings may take place – (iii) through video conference."). Second, Atugah was given almost an hour before the hearing to consult privately with his attorney. After this consultation, they made five amendments to the application. When Atugah still expressed hesitation about the application, the IJ faxed him a copy of the application, and Atugah again had time to review it for accuracy and completeness. He made a spelling correction, and the IJ checked the box to indicate that Atugah was seeking withholding under the CAT. After these additional amendments, Atugah said that he was satisfied with the application and took an oath that the application was true. In sum, the IJ painstakingly ensured that Atugah had ample time to meet with his attorney and amend his application. Atugah's material omissions thus cannot be said to be due to his participation via video conference.[1]

---

[1] To the extent that Atugah raises a due process argument, he must "establish both 'error and substantial prejudice' to prevail on a due process challenge to deportation proceedings." *Garza-Moreno v. Gonzales*, 489 F.3d 239, 241 (6th Cir. 2007) (quoting *Gishta v. Gonzales*, 404 F.3d 972,

8

**B.**     **Withholding of Removal**

Atugah challenges the denial of his request for statutory withholding of removal pursuant to the Act.  To establish eligibility for withholding of removal, a petitioner must show that his "life or freedom would be threatened in the proposed country of removal on account of race, religion, nationality, membership in a particular social group, or political opinion."  8 C.F.R. § 208.16(b).  The petitioner bears the burden to establish a "clear probability" of persecution based on one of these protected grounds.  *See Kouljinski v. Keisler*, 505 F.3d 534, 544 (6th Cir. 2007) (citing *Almuhtaseb v. Gonzales*, 453 F.3d 743, 749 (6th Cir. 2006)).  A petitioner can meet this burden by showing either that 1) he has suffered past persecution, which creates a rebuttable presumption of future persecution, or 2) he will more likely than not be persecuted on a protected ground upon return.  8 C.F.R. § 208.16(b). If a petitioner has demonstrated past persecution, a presumption of future persecution can be rebutted if the IJ finds that "[t]here has been a fundamental change in circumstances such that the applicant's life or freedom would not be threatened on account of any of the five grounds" or that

---

979 (6th Cir. 2005)).  "A showing of prejudice is essentially a demonstration that the alleged violation affected the outcome of the proceedings. . . ."  *Gishta*, 404 F.3d at 979 (quoting *Larita-Martinez v. INS*, 220 F.3d 1092, 1095 (9th Cir. 2000)) (internal quotation marks omitted).  Because participation by video conference is statutorily authorized, *see* 8 U.S.C. § 1229a(b)(1)(A)(iii), Atugah has not shown any error.  Moreover, because Atugah was given time to consult with his attorney and amend his application, he cannot demonstrate substantial prejudice.  The IJ considered Atugah's testimony, gave him a chance to explain his omissions, and made a decision based on the record.  Atugah has thus not shown that his participation by video conference affected the outcome of the proceedings or that he has been deprived of a fair hearing.  *See Garza-Moreno*, 489 F.3d at 241 (rejecting petitioners' contention that the video conferencing equipment was unreliable and violated their due process rights); *Hermez v. Gonzales*, 227 F. App'x 441, 445 (6th Cir. 2007) (rejecting petitioner's argument that participation via video conference violated his right to a fair hearing because "[t]he IJ considered the record and all of the testimony in the case and made a decision based on that information").

"[t]he applicant could avoid a future threat to his or her life or freedom by relocating to another part" of his native country and it would be reasonable to do so. 8 C.F.R. § 208.16(b)(1)(i).

Atugah claims that the IJ erred in concluding that he had not established past persecution. As mentioned above, the IJ did not find Atugah's claims credible that he was beaten and suffered disproportionately at his circumcision. However, the IJ concluded that even if Atugah's claims were credible, he had not established past persecution on account of a protected ground. The threats and harm incurred by Atugah's family members were due to the personal animosity between the former president and Choge, not his or his family's political opinions. Atugah conceded this point during his hearing:

> Q: Because Ebraheme's father, Simon [Choge], had a, had an affair with the president's former wife. That's personal. How is that political?
>
> A: Your Honor, you're right. It sounds, it sounds personal.
>
> Q: Okay. Can you tell me then, sir exactly, how is it political or it's not?
>
> A: Because yes.
>
> Q: Is it political or is it personal?
>
> A: It has been personal.

(Hearing Tr. at 101.) Although the former president was angry with Choge, and consequently members of Choge's family, this anger stemmed from the entirely personal nature of Choge's affair with the former president's wife and does not qualify as a protected ground for purposes of withholding of removal. *See Zoarab v. Mukasey*, 524 F.3d 777, 781 (6th Cir. 2008) (rejecting petitioner's asylum and withholding of removal claim because he "fear[ed] retribution solely over personal matters"). Moreover, it is worth noting that Choge and former President Moi were in the

10

same political party, and that Choge became the assistant minister to the office of the president in 1997, twenty-one years after allegedly having an affair with former President Moi's wife. It seems odd, to say the least, that if the former president were so angry at Choge that he would murder his children, he would also appoint him to serve as his personal assistant minister. In addition, Ebraheme, one of the cousins whose death was allegedly attributable to former President Moi, was married to Moi's daughter. These facts justify the IJ's skepticism as to the validity of Atugah's claim of persecution on account of his political opinion.

Likewise, Atugah has failed to explain how he was persecuted on account of his membership in a particular social group. While a family can constitute a particular social group, *see Al-Najar v. Mukasey*, 515 F.3d 708, 714 (6th Cir. 2008), Atugah has not met his burden to show that his family has been targeted by the former president. In particular, Atugah has failed to explain how the former president's anger against Choge has resulted in harm for several of Choge's children and Choge's nephew Atugah but not Choge himself, Choge's wife, Choge's brother (Atugah's father), any of Choge's other children, or any of Atugah's siblings. In addition, Atugah did not show that his special circumcision constituted membership in a particular social group because he failed to explain what the group was or how or why he would be persecuted on account of it.

Even assuming that Atugah had shown that he was persecuted on account of his membership in a particular social group on the basis of either his family or his unusual circumcision, the IJ found that the presumption of future persecution was rebutted both because conditions have changed in Kenya and because Atugah could avoid any future harm by relocating to a different part of Kenya. In reviewing the IJ's findings, we agree. Former President Moi left office in 2002, and his power

11

is thus more limited than it was when Atugah last lived in Kenya. Secondly, the injuries and harm that Atugah described all occurred in and around his village of Nandi. Atugah testified that while he was at school in Nairobi, eight hours away from his home village, he did not encounter any problems. If Atugah returned to Kenya, he could relocate to Nairobi and likely avoid any harm from his purported persecutors. There is thus substantial evidence to support the IJ's determination that Atugah has failed to establish his eligibility for withholding of removal under the Act.

## C. Convention Against Torture

A petitioner for withholding under the CAT must show that it is more likely than not that he would be tortured upon his removal. 8 C.F.R. § 1208.16(c)(2). The previous credibility analysis for withholding of removal under the Act is applicable to eligibility under the CAT. *See Shan Sheng Zhao*, 553 F.3d at 446. Because there is substantial evidence to support the IJ's finding that Atugah will not be persecuted upon return to Kenya, as explained above, the IJ did not err in similarly concluding that Atugah is not more likely than not to be tortured upon removal. *See id*. ("Since [petitioner] has failed to satisfy the threshold showing of credibility to warrant withholding of removal under the Act, it logically follows that he cannot demonstrate that he is entitled to withholding under the CAT.").

### IV.

For the foregoing reasons, we affirm the denial of withholding of removal under the Act and the CAT to Atugah.