RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 14a0021p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

LYUBOV SLYUSAR, DENYS SLYUSAR and
VLADYSLAV SLYUSAR,

                        *Petitioners*,

       *v*.

ERIC H. HOLDER, JR.,

                        *Respondent*.

No. 13-3071

_____

On Petition for Review of an Order from the Board of Immigration Appeals.
Nos. A097 998 956; A099 201 279; A099 201 280—Detroit, MI.

Argued: October 11, 2013

Decided and Filed: January 30, 2014

Before: KEITH, GUY, and GIBBONS, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Troy A. Murphy, MURPHY LAW OFFICES, Avon, Ohio, for Petitioners. Claire L. Workman, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Troy A. Murphy, MURPHY LAW OFFICES, Avon, Ohio, for Petitioners. Kathryn M. McKinney, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

_____

## OPINION

_____

KEITH, Circuit Judge. Petitioner Lyubov Slyusar ("Slyusar") and her two minor children seek review of the Board of Immigration Appeals' ("BIA") dismissal of her appeal of an immigration judge's ("IJ") denial of her applications for asylum, withholding of removal, and protection pursuant to the Convention Against Torture

("Torture Convention").  We **DENY** Slyusar's petition for review.  We also **DENY** as moot Slyusar's motion for a stay of removal pending adjudication.

## BACKGROUND

The facts underlying Slyusar's claim are not uncontroverted, as the Immigration Judge determined that her testimony was incredible.  Slyusar testified to the following:

Slyusar is a Russian native and a Ukranian citizen who worked as a social worker, assisting pensioners, in Shepetovka, Ukraine from May 1999 to December 2002. In January 2001, Slyusar joined a private social organization called Caring Hands that educated pensioners about their rights.  Caring Hands asked Slyusar to record unlawful non-cash pensions being distributed by her office, and she agreed.  She discovered that a significant amount of pension fraud was taking place in her office, issued a report on her findings, and gave the report to her supervisor at Caring Hands.  The report identified certain government officials by name.  Slyusar approached the supervisor regarding the supervisor's intentions for the report, and the supervisor informed her that she would not take any further action regarding the report.  Slyusar then took the report to a local radio station, which broadcasted the contents of the report on November 12, 2002.  While Slyusar was not named in the broadcast, the names of the officials identified in the report were disclosed.

After the broadcast, Slyusar received phone calls that threatened her life and the lives of her children.  She did not inform the police of these calls because one of the callers threatened her with "consequences" if she did.  On December 4, 2002, a uniformed police officer and two security guards in civilian attire arrested Slyusar while she was walking home from work.  She was taken to a police station, where the officer and guards screamed at her and instructed her to sign papers apologizing to the government officials and confessing that she had slandered them.  Upon Slyusar's refusal to sign the papers, the officers and guards disrobed her, tied her legs and arms, and beat her. They then placed Slyusar in a cell with four men, where she was raped by three of the men while the fourth held down her hands.  Following the rapes, a guard

brought her a liquid substance and ordered her to drink it.  Slyusar drank the liquid and was taken to another cell, where she vomited.  After a week of detention, the guards allegedly gave her a shot that gave her an intense headache, and threw pepper powder in her eyes, mouth and nose.  She was then detained for another week, and was subsequently released, without being charged with a crime.

Upon her return home, Slyusar's parents delivered to her office a request to resign from her job.  She then moved to a small village approximately thirty minutes away from Shepetovka and lived in a house belonging to her husband's grandmother.  Slyusar's husband was living in the United States, where he cared for his grandmother.  When Slyusar informed her husband that she had been raped, he informed her that he could no longer have a sexual relationship with her and demanded a divorce.  Though, according to her account, Slyusar was in hiding at the time, she obtained a divorce on February 25, 2003, by commissioning her parents to deliver divorce papers to her husband.

On March 3, 2003, a police officer and two guards allegedly found Slyusar in the village, violently apprehended her, and dragged her to a police car, ultimately returning her to the same police station where she had been previously detained.  There, she was detained in a cell for several hours before being taken to an interrogation room for questioning.  Some of the people whom Slyusar had identified in her report for Caring Hands were present in the room.  She was then beaten, losing consciousness after receiving two blows to the head.  She awoke in a hospital and remained there for a week before fleeing.  Friends of Slyusar's parents then contacted smugglers who agreed to help Slyusar escape to the United States for a fee of $2,500.00.  She used a Russian passport and entered the United States on May 9, 2003 as Julia Pusharova.

Slyusar has lived in Warren, Michigan since her arrival in the United States, save for a brief stay in New York.  While in New York, she married a United States citizen, Mr. Diterlizzi, who promised to help her with her immigration status if she married him.  Slyusar also maintains that she retained counsel on May 19, 2003, in order to file an

application for asylum. That attorney, Simon Edelstein, allegedly never filed the asylum petition.

The record in this case reflects that Slyusar applied to adjust her status to that of lawful permanent resident based on her marriage to Mr. Diterlizzi. Slyusar's two eldest children applied for adjustment of status as well. On September 20, 2005, the United States Citizenship and Immigration Services denied the applications. On October 20, 2005, Slyusar filed an asylum application, and Slyusar's case was referred to an immigration court.

In 2005, the Department of Homeland Security issued Notices to Appear, which alleged that Slyusar and two of her children were subject to removal from the United States because they had entered the country without inspection. Slyusar then requested asylum, withholding of removal, and protection under the Torture Convention. The IJ denied all of Slyusar's applications for relief in 2011, after determining that many discrepancies existed between her testimony and the evidence that she submitted, along with internal inconsistencies within the testimony itself. The IJ also held that Slyusar's asylum application was not timely filed, and further found that Slyusar failed to demonstrate extraordinary circumstances justifying the delay in filing. The IJ determined that because Slyusar had not complied with the requirements for demonstrating extraordinary circumstances, she was barred from raising a justification based on extraordinary circumstances before the immigration court. The IJ noted further that even if Slyusar's application had been timely filed, it would have been denied because of Slyusar's incredible testimony. Finally, the IJ found that because Slyusar had failed to prove her eligibility for asylum, she could not prove eligibility for withholding of removal, and that her adverse credibility determination was fatal to her Torture Convention claim.

The BIA dismissed Slyusar's appeal on December 20, 2012, declining to disturb the adverse credibility determination of the IJ. The BIA agreed with the IJ that Slyusar's testimony and evidence were inconsistent and incredible, and found no error in the IJ's denial of Slyusar's application for asylum and withholding of removal. The BIA also

found that Slyusar's application for Torture Convention protection failed. Finally, the BIA refused to accept the additional evidence that Slyusar presented on appeal on the basis that the BIA was charged with reviewing an existing record, not with creating the record.

## I.

### A.       *Standard of Review*

Decisions of the BIA are reviewed under the deferential substantial evidence standard, "in which we uphold a BIA determination as long as it is supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Marku v. Ashcroft*, 380 F.3d 982, 986 (6th Cir. 2004) (internal quotation marks omitted). While this Court reviews legal conclusions made by the BIA *de novo*, *see Karimijanaki v. Holder*, 579 F.3d 710, 714 (6th Cir. 2009), administrative factual findings are reviewed for substantial evidence and "are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." *Id.* (quoting 8 U.S.C. § 1252(b)(4)(B)). Credibility determinations are also reviewed for substantial evidence. *See Zhao v. Holder*, 569 F.3d 238, 246 (6th Cir. 2009). "When the BIA adopts the IJ's reasoning and supplements the IJ's opinion, that opinion, as supplemented by the BIA, becomes the basis for review." *Id.* This Court "directly reviews the decision of the IJ while considering the additional comment made by the BIA." *Id.* (quoting *Mapouya v. Gonzales*, 487 F.3d 396, 405 (6th Cir. 2007)).

### B.       *The REAL ID Act*

The REAL ID Act of 2005, Pub. L. No. 109-13, 119 Stat. 302, applies to "applications for asylum, withholding of removal, or other relief from removal filed on or after May 11, 2005." *El-Moussa v. Holder*, 569 F.3d 250, 256 (6th Cir. 2009). While the law previously only permitted an IJ to consider inconsistencies that went to the heart of an applicant's claim when making an assessment of the applicant's credibility, *see Ren v. Holder*, 648 F.3d 1079, 1084 (9th Cir. 2011), the REAL ID Act allows triers of fact to consider "any inaccuracies or falsehoods in [an applicant's] statements, without

regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim, or any other relevant factor." 8 U.S.C. § 1158(b)(1)(B)(iii). An adverse credibility determination is fatal to claims for asylum and relief from removal, preventing such claims from being considered on their merits. *See Perlaska v. Holder*, 361 F.App'x 655, 661 & n.6 (6th Cir. 2010).

C.      *Slyusar has not demonstrated sufficient evidence to compel this Court to reverse the IJ's adverse credibility determination.*

In Slyusar's case, "[t]he IJ denied relief and the BIA upheld the decision based on the IJ's finding that [Slyusar] did not testify credibly." *El-Moussa*, 569 F.3d at 255. Therefore, "we review the IJ's credibility determination under the deferential 'substantial evidence' standard." *Id*. (citation omitted).

Adverse credibility determinations are conclusive unless any reasonable adjudicator would be compelled to make a contrary conclusion. *Id* at 256. That this Court could conceivably make a contrary conclusion is not enough to justify reversal of the IJ's decision; compulsion is required. *See Singh v. Ashcroft*, 398 F.3d 396, 404 (6th Cir. 2005).

In the instant case, the IJ found numerous inconsistencies between Slyusar's testimony and the information she had previously given to the Department of Homeland security—including discrepant information regarding her employment history, her date of entry into the United States, whether or not she had a Ukranian passport in her possession when she arrived in the United States, her marriages, and her attempts to file asylum claims. Under the REAL ID Act, these inconsistencies are sufficient reason for an IJ to find Petitioners incredible and to subsequently deny them asylum, withholding of removal, or protection under the Torture Convention. The Board declined to disturb the IJ's findings, agreeing that Slyusar had made internally inconsistent claims in support of her asylum petition.

Slyusar has not presented evidence that would compel a reasonable adjudicator to disagree with the IJ's finding. Her appeal is conclusory, providing this Court with no

evidence that it could use to contradict the IJ's fact-based determination that Slyusar's credibility was riddled with inconsistencies. "[I]t is a settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *United States v. Villareal*, 491 F.3d 605, 611 (6th Cir. 2007) (citations omitted). While Slyusar contends that the alleged inconsistencies in her testimony do not go to the heart of her claim, under the REAL ID Act, even ancillary inconsistencies in a petitioner's testimony support adverse credibility determinations. *See El-Moussa*, 569 F.3d at 256. Finally, even if this Court agreed with Slyusar that the IJ committed reversible error by failing to allow her to submit evidence in support of her claim that her asylum application should be deemed timely filed, enough inconsistencies in her testimony and documents would exist to support the IJ's determination. Accordingly, while another IJ might have ruled differently, we find that no evidence has been presented that compels a different ruling. We are thus bound by the decision of the IJ and the additional observations of the BIA.

D.      *Issues not addressed by the BIA are not properly before this Court.*

The BIA declined to address whether Slyusar would have met her burden of proof for asylum or withholding of removal, had her testimony been deemed credible, because the IJ determined that her testimony was not credible. Therefore, whether or not Slyusar could meet her burden of proof is not properly before this Court. *See INS v. Orlando Ventura*, 537 U.S. 12, 16 (2002).

The BIA agreed with the IJ that Slyusar's testimony—including her claim that her attorney failed to timely file her asylum claim—was incredible. Therefore, the timeliness of Slyusar's asylum application is properly before us. However, as the timeliness of Slyusar's asylum claim is primarily a factual matter, we have no reason to review the BIA's ruling that her claim was not timely filed. *See Khozhaynova v. Holder*, 641 F.3d 187, 191 (6th Cir. 2011).

E.      *The IJ's adverse credibility determination is fatal to Slyusar's claims for asylum,
        withholding of removal, and relief under the Convention Against Torture
        ("Torture Convention").*

Slyusar's application for relief under the Torture Convention was addressed by the BIA, and it is therefore properly before this Court. Applicants for protection under the Torture Convention must demonstrate that they would be more likely than not to suffer torture if removed. *See Khozhaynova*, 641 F.3d at 197. Before making a decision on the merits of a claim, however, the IJ must determine whether the applicant is credible; an application deemed incredible will not be reviewed on the merits. *See Zhao*, 569 F.3d at 243.

As discussed above, the IJ determined that Slyusar's testimony was incredible, and the IJ's adverse credibility determination was dispositive of her application for asylum and withholding of removal. "The same credibility standard applies to claims for asylum, withholding of removal, and for relief under the torture convention." *El-Moussa*, 569 F.3d at 256. The IJ's adverse credibility determination, then, necessarily disposes of Slyusar's application for Torture Convention protection.

## II.

Slyusar moved for a stay of removal pending adjudication of her petition for review on August 31, 2013. The government opposed Slyusar's motion on September 9, 2013. In order to qualify for a stay of removal, this Court must determine whether the applicant for the stay "has made a strong showing that he is likely to succeed on the merits"; 2) whether the applicant will be "irreparably injured absent a stay"; 3) "whether issuance of the stay will substantially injure the other parties interested in the proceeding"; and 4) "where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009). The first two factors are "the most critical." *Id.* The third and fourth factors merge when the Government is the opposing party. *Id.* at 435. While the grant of a stay is governed by legal standards, it is ultimately subject to a court's discretion. *Id.*

Slyusar satisfies the second prong of the test, as removal would be an irreparable injury. As to the third and fourth prongs, which are merged in the instant case, the

government would not be substantially injured by the grant of a stay, and the public certainly has an interest in "preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm." *Id*. at 436.

Slyusar does not satisfy the first prong of the test, however, because she has not made a strong showing that she would likely succeed on the merits. However, we note that Slyusar has not been afforded the opportunity to demonstrate the strength of her case on the merits. Indeed, the IJ and BIA have not considered the merits of her case, due to the dispositive nature of the IJ's adverse credibility determination under the REAL ID Act. In effect, the REAL ID Act forecloses stays of removal to asylum-seekers who have received adverse credibility determinations by constructively preventing them from proving eligibility for such relief.

In any case, Slyusar's motion is applicable during the pendency of adjudication, and this Court has now reached a disposition as to Slyusar's case. Therefore, Slyusar's motion is moot.

## CONCLUSION

Though we rule against Slyusar here, we wish to make the following cautionary note: We respect Congress's calculated decision to imbue upon an IJ a significant amount of deference with regards to adverse credibility determinations. However, we wish to emphasize that "[a]lthough the REAL ID Act expands the bases on which an IJ may rest an adverse credibility determination, it does not give a blank check to the IJ enabling him or her to insulate an adverse credibility determination from our review of the reasonableness of that determination." *Ren*, 648 F.3d at 1084 (quotation omitted). As the *Ren* Court recognized, "victims of abuse often confuse the details of particular incidents, including the time or dates of particular assaults and which specific actions occurred on which specific occasion; thus, the ability to recall precise dates of events years after they happen is an extremely poor test of how truthful a witness's substantive account is." *Id*. at 1085-86 (internal citations and quotation marks omitted).

We are concerned that the provisions of the Act may have the effect of punishing applicants for their trauma. The *Ren* court disagreed with the IJ's determination that petitioner was not a committed Christian as petitioner claimed, after interpreting petitioner's testimony to mean that church attendance was a "low priority." *Id.* at 1087. "In reviewing an adverse credibility determination, 'the mistakes that witnesses make in all innocence must be distinguished from slips that ... show that the witness is a liar or his memory completely unreliable.'" *Id.* (quoting *Kadia v. Gonzales*, 501 F.3d 817, 822 (7th Cir. 2007)).

We are further concerned by the precedent that, even if an omission or inaccuracy is categorized as *de minimis*, it may still support an IJ's adverse credibility finding. *See Harutyunyan v. Holder*, 512 F. App'x 548, 553 (6th Cir. 2013). Although the credibility determination no longer includes a requirement that the inconsistency be material to the asylee's claim, we urge courts to remember that any inconsistencies or inaccuracies must always be considered in light of the "totality of the circumstances." 8 U.S.C. § 1158(b)(1)(B)(iii). With this in mind, we observe that credibility determinations can often be based on external factors not indicative of veracity. *See, e.g., Solomon v. Gonzales*, 454 F.3d 1160, 1164 (10th Cir. 2006); *Zeru v. Gonzales*, 503 F.3d 59, 73 (1st Cir. 2007).[1] Accordingly, because the Act permits IJs to deny asylum applications based on inconsistencies that are unrelated to the claim itself, we urge the exercise of due care in evaluating such inconsistencies when reaching a credibility determination.

Here, this Court rules as it does because it is bound by the decision of the Board, in the absence of evidence that would compel a reasonable adjudicator to conclude contrarily. Therefore, and in conclusion, we **DENY** Slyusar's petition for review of the Board's decision. We also **DENY** her motion for a stay of removal pending adjudication as moot.

---

[1] *See also* James P. Eyster, *Searching for the Key in the Wrong Place: Why "Common Sense" Credibility Rules Consistently Harm Refugees*, 30 B.U. INT'L L.J. 1, 30-31 (2012); Juliet Cohen, *Questions of Credibility: Omissions, Discrepancies, and Errors of Recall in the Testimony of Asylum Seekers*, 13 INT'L J. REFUGEE L. 293, 309 (2001).