**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**

File Name: 15a0777n.06

**Case No. 15-3066**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

Dec 02, 2015

DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| VIKRAMJEET SINGH, | ) | |
| | ) | |
| *Petitioner*, | ) | |
| | ) | ON PETITION FOR REVIEW |
| v. | ) | FROM THE UNITED STATES |
| | ) | BOARD OF IMMIGRATION |
| LORETTA E. LYNCH, U.S. Attorney General, | ) | APPEALS |
| | ) | |
| *Respondent*. | ) | |
| | ) | |
| | ) | O P I N I O N |

BEFORE:    COLE, Chief Judge; SUTTON, Circuit Judge; BELL, District Judge.[*]

COLE, Chief Judge.    Petitioner Vikramjeet Singh, a native and citizen of India, was arrested after illegally entering the United States. Singh applied for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"). The Board of Immigration Appeals ("BIA") denied Singh's application on the grounds that he was not credible, and had not met his burden of showing that he faces persecution or torture if he returns to India. Singh now petitions for review of the BIA's decision. 8 U.S.C. § 1252(a). Finding the BIA's credibility determination was supported by substantial evidence, we deny the petition.

---

[*] The Honorable Robert Holmes Bell, United States District Judge for the Western District of Michigan, sitting by designation.

## I.    Background

Vikramjeet Singh was born in India on February 18, 1976.  A follower of the Sikh religion, he lived in the town of Tanda Urmar in the majority-Sikh state of Punjab where he worked as a taxi driver.  When he left India to come to the United States in October 2010, Singh left behind his wife and infant daughter; his wife gave birth to their second daughter about two months after he was arrested in the United States.

Singh joined the Amritsar Simranjit Singh Mann Party ("Mann Party"), a Sikh religious and political organization, in 2007.  The Mann Party's main political objective is the creation of an independent Sikh nation.  Singh, however, says that he primarily viewed the party as a religious organization and assisted with its charitable mission of providing food and clothing to the impoverished.

Singh claims he fled to the United States because he was persecuted by Hindu members of the Congress Party, one of the most popular and powerful political parties in India.  Specifically, Singh described three incidents where he was beaten by members of the Congress Party.  Based on these incidents, Singh testified that he fears he will be killed if he returns to India.

First, Singh claims he was driving to a Mann Party rally in December 2009 when a group of Congress Party supporters stopped him and his companions.  The crowd "started using foul language."  This escalated to a fist fight between the groups in which Singh and his companions were beaten.  Singh's group eventually made it to the rally and recounted the incident to Mann Party leaders.  Party leaders took them to the police station, but Singh says the police took no action "because the country is being ruled by [the] Congress Party."

Second, Singh claims he was attending a Mann Party rally in February 2010 when the speaker, Mann Singh (the head of the Mann Party), "used some offensive words against Hindus." Singh alleges Congress Party members who were in attendance then started a fight, during which Singh was injured.

Third, Singh claims that on August 15, 2010, he had another altercation with Congress Party supporters as he drove with his wife and infant daughter to attend a Mann Party rally. As they were driving to the rally, they passed through a competing Congress Party rally. When Singh honked his horn so his car could pass, the crowd started "us[ing] foul language." Singh says someone pulled him out of the car and a number of people began beating him. Singh also says the crowd "abus[ed]" his wife by using "very bad" language, though they did not physically assault her. Singh and his family eventually reached the rally, and were again taken by party leaders to see the police. After keeping them waiting for "a long time," the police took statements from Singh and his wife and said they would "go take some action," but they never did.

The same day as this third encounter—August 15, 2010—Singh alleges he was alone when he was stopped by members of the Congress Party. He says the Congress Party members told him that if he continued supporting the Mann Party he would be killed. This was the last straw, and made Singh decide to leave the country.

Singh paid a friend to get him to the United States. On October 8, 2010, Singh flew out of Delhi. After traveling through several countries, Singh finally arrived in the United States when an "agent" smuggled him across the Mexican border. Singh did not seek asylum in any of these other countries.

Singh's family has since relocated to the city of Gobindgarh, also in Punjab. They have not experienced any persecution or violence since Singh left.

Singh was arrested on October 26, 2010, in Rio Grande City, Texas. An immigration officer interviewed Singh and found he had a credible fear of persecution. Singh conceded removability and filed an application for asylum. He posted bond, was released from custody, and moved to Battle Creek, Michigan. Singh filed a corrected application for asylum on May 24, 2011.

On August 1, 2012, Singh had a merits hearing before an immigration judge ("IJ") in Detroit, Michigan. Singh was the only witness who testified. A continued hearing was held on October 1, 2012, so Singh could present corroborating documents that he had failed to bring to the previous hearing. *See* 8 U.S.C. § 1158(b)(1)(B)(ii). In support of his claims, Singh submitted, among other documents, two Indian driver's licenses, an affidavit from his wife, and a letter from the Mann Party's Secretary.

On March 8, 2013, the IJ issued a decision denying Singh's application. The IJ found that Singh was not credible, and that the documents he submitted were either fraudulent or fabricated. Thus, Singh had not met his burden of proving his claims for asylum, withholding of removal, or protection under the CAT. The IJ also found that Singh's application was frivolous because it contained knowingly false material.

On December 30, 2014, the BIA issued a written opinion affirming the IJ's denial of asylum, withholding of removal, and protection under the CAT. However, the BIA reversed the IJ's determination that Singh's application was frivolous.

## II.     Analysis

### A.  Legal Standards

"Because the BIA did not summarily affirm or adopt the IJ's reasoning and provided an explanation for its decision, we review the BIA's decision as the final agency determination." *Young Hee Kwak v. Holder*, 607 F.3d 1140, 1143 (6th Cir. 2010) (quoting *Ilic-Lee v. Mukasey*, 507 F.3d 1044, 1047 (6th Cir. 2007)).  We review the BIA's factual findings, including its credibility determinations, "[u]nder the deferential substantial evidence standard." *Khozhaynova v. Holder*, 641 F.3d 187, 191 (6th Cir. 2011).  The BIA's decision is "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); *Yu v. Ashcroft*, 364 F.3d 700, 702–03 (6th Cir. 2004).

In order to succeed on an application for asylum, an applicant must show that he "has suffered past persecution on the basis of race, religion, nationality, social group, or political opinion; or show that he has a well-founded fear of persecution on one of those same bases." *Cruz-Samayoa v. Holder*, 607 F.3d 1145, 1150 (6th Cir. 2010) (internal quotations marks, alterations, and citation omitted); *see* 8 C.F.R. § 1208.13(b).  Similarly, withholding removal requires an applicant to show that he faces a "clear probability" of persecution based on one of these same protected grounds. *Almuhtaseb v. Gonzales*, 453 F.3d 743, 749 (6th Cir. 2006).  To qualify for CAT protection, the applicant must show it "is more likely than not that he or she would be tortured if removed to the proposed country of removal."  8 C.F.R. § 1208.16(c)(2).

Under the REAL ID Act, when determining an asylum applicant's credibility, the trier of fact may consider "any inaccuracies or falsehoods in [an applicant's] statements, without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim, or any other relevant factor."  8 U.S.C. § 1158(b)(1)(B)(iii).  An adverse credibility

determination is fatal to claims for asylum, withholding of removal, and protection under the CAT. *Slyusar v. Holder*, 740 F.3d 1068, 1072, 1074 (6th Cir. 2014). This is because a finding that the applicant "did not testify credibly precludes her from meeting any of these [claims'] burdens of proof." *El-Moussa v. Holder*, 569 F.3d 250, 257 (6th Cir. 2009).

**B. BIA's Credibility Determination Was Supported by Substantial Evidence**

We review the grounds relied on by the BIA to determine whether the adverse credibility determination was supported by substantial evidence.[1] *See Khozhaynova*, 641 F.3d at 193 (citing *Zhao v. Holder*, 569 F.3d 238, 247–48 (6th Cir. 2009)). The BIA highlighted several inconsistencies in Singh's testimony in finding him not credible. When considered as a whole, *see El-Moussa*, 569 F.3d at 256, they provide substantial evidence supporting the BIA's decision.

When he was first arrested, Singh did not say he was in the United States seeking asylum. Instead, he told Border Patrol officers that he came to the United States to look for employment in New York. Only later did he claim religious or political persecution.

Singh's claims of persecution are based on three specific incidents where he was allegedly assaulted by members of the Congress Party. But Singh did not mention the February 2010 incident in either his initial or corrected asylum applications. Instead, Singh only first raised it in his testimony at the first merits hearing. We have previously held that an application for asylum need not contain every detail of the claim as long as it "contain[s] at least some indication of the type of assertions that will be made." *Kaba v. Mukasey*, 546 F.3d 741, 749–50 (6th Cir. 2008). Singh's application certainly contains more than vague, non-specific allegations.

---

[1] In his brief, Singh challenges some credibility-related findings made by the IJ that the BIA either did not address (*see* Petitioner's Br. at 16–17 (discussing whether Singh's appearance is consistent with being a Sikh)), or explicitly rejected (*see id.* at 20–21 (discussing Singh's failure to detail which party leaders took him to the police station)). Because the BIA did not rely on these findings, we need not address them here. *See Slyusar*, 740 F.3d at 1073 (citing *INS v. Orlando Ventura*, 537 U.S. 12, 16 (2002)).

*See id.* Notably, though, Singh detailed the other two incidents in his application, but completely omitted any mention of the February 2010 incident. The absence of such an important episode to his claims supports the BIA's skepticism about this incident. *See, e.g.*, *Sy v. Holder*, 337 F. App'x 487, 495 (6th Cir. 2009); *Atugah v. Holder*, 321 F. App'x 431, 436 (6th Cir. 2009).

Further, Singh submitted inconsistent evidence describing the other two incidents. As to the December 2009 incident, Singh testified that Congress Party members beat him as he was on his way to a Mann Party rally. But Singh's wife submitted an affidavit saying that the two of them were on their way to meet a relative when Hindus stopped and assaulted them. Singh was also inconsistent as to whether his wife was even present: in his asylum application he attested that his wife was with him and the Congress Party "verbally yelled and used abusive language," but when he first testified to the IJ about the incident he said that she was not with him on that day. At the continued hearing, he again changed his story and said that his wife was present at both the December 2009 and August 2010 incidents.

As to the August 2010 incident, Singh testified that Congress Party members beat him and verbally harassed his wife. Again, his wife's affidavit contradicts his testimony, as she says that both of them were "beaten." Singh accounted for this contradiction by explaining that, in his culture, verbal harassment is equivalent to physical beating, but the BIA found this to be an inadequate explanation for the discrepancy.

This confusion between verbal harassment and physical beating also arose in Singh's complaints about the police. Singh claimed in his asylum applications that the police beat him when he tried to report his altercations with the Congress Party; he also claimed the police "harassed" him and forced him to give them free rides in his taxi. During his testimony regarding the three incidents, however, Singh criticized the police for failing to investigate his

complaints—he did not mention any beatings. When pressed to explain the discrepancy, Singh admitted the police never actually beat him and explained they only "use[d] very filthy language which I consider is as bad as beating somebody." Singh testified that he understood the difference between verbal abuse and physical violence, so his attempts to explain away these discrepancies were unconvincing to the BIA.

Another inconsistency highlighted by the BIA was Singh's alternating description of himself as either a "member" of or a "worker" for the Mann Party. Singh argues that this is merely an issue of translation—that the two words mean the same thing. But Singh also often objected to being called a member—he repeatedly said he was "just" a worker. One wonders why, if "member" and "worker" are interchangeable terms, Singh made such an effort to distinguish them. Regardless of the reason, the BIA found Singh's explanation for his inconsistent terminology "not persuasive."

Similarly, in Singh's initial interview with an immigration officer, he stated that he had never been a member of any political party. Singh argues that he views the Mann Party as a primarily religious organization, rather than a political one. And yet, the very first time he was asked about the Mann Party at his merits hearing, he described it as a "religious party *and a political party*." This type of direct contradiction certainly calls into question Singh's relationship to the Mann Party.

A few of the inconsistencies highlighted by the BIA are less significant. For example, when testifying about the August 2010 incident, Singh stated that his wife and daughters were with him. But Singh's second daughter was not born until December 30, 2010, four months after the incident and two months after Singh had been apprehended in the United States. As another example, Singh's asylum application lists six countries he traveled through to reach the United

States, but while testifying at his hearing he initially listed only four. After this oversight was pointed out to him, though, he was able to name all six. While these are certainly "inaccuracies" that can properly be considered in assessing Singh's credibility, we have previously cautioned that the BIA should "exercise due care" before relying on *de minimis* inconsistencies to assess credibility. *See Slyusar*, 740 F.3d at 1074–75. Still, such inconsistencies can be properly considered as part of the totality of the circumstances even if they would not themselves be sufficient to support an adverse credibility finding. *See El-Moussa*, 569 F.3d at 256.

The BIA also found that the documents Singh offered at the October 1, 2012, hearing did not rehabilitate his credibility. Singh testified that he did not bring his Indian driver's license to the original hearing because it was not translated into English. But the licenses he submitted at the continued hearing were in English. In addition to the previously described discrepancies between Singh's testimony and his wife's affidavit, the BIA also noted that the affidavit was notarized several days before Singh's wife signed it. And the letter from the Mann Party's Secretary, which was offered to prove Singh's affiliation with the party, was found to be "fraudulent on its face" due to its being dated June 27, 2012—more than a month before the August 1, 2012, hearing where Singh testified that he would contact people in India to request such a letter. Even crediting the substance of the letter, the BIA concluded it does not help Singh because it provides no details as to his activities with the Mann Party or the past persecution he suffered.

Our role is not to evaluate Singh's credibility in the first instance. We only ask whether the BIA's decision is supported by substantial evidence. Although Singh offers explanations for most of the inconsistencies in his evidence, they do not "meet the high standard of *compelling* a

contrary result." *Yu*, 364 F.3d at 704. The BIA was not required to accept them, and there is substantial evidence supporting that decision.

### III.    Conclusion

For the forgoing reasons, we deny Singh's petition for review.