HELENE N. WHITE, Circuit Judge,
dissenting.
I respectfully dissent. I conclude that the IJ’s adverse credibility determination was unsupported by substantial evidence. As to corroborating evidence, the IJ imposed an overly-stringent standard instead of the “reasonably available corroboration” standard. See Lin v. Holder, 565 F.3d 971, 977 (6th Cir.2009). The IJ disbelieved that Mamane was a volunteer for Micro Credit in Africa (MICA), the nongovernmental organization that assisted her and her siblings after they were orphaned, because Mamane could not recall what the last two letters of the English acronym stood for.[1] The IJ disregarded that it was Mamane’s work for MPPDHD, not MICA, that was central to her claim, and that Mamane recalled the names of the two individuals at MICA, who facilitated her attending the conference in Chicago in 2008.
The IJ was also troubled by the fact that Mamane’s original application stated that she received menacing calls but did not mention text messages. Mamane testified that she told the asylum officer that she received both menacing calls and text messages when she returned to Niger from Chicago. This trivial inconsistency does not support an adverse credibility finding. The point is that Mamane received menae- *887 ing communications on her phone, whether calls or text messages.
The IJ also discounted the corroborating evidence Mamane presented regarding her work for MPPDHD because it came from the organization itself rather than from its president directly. “[W]here it is reasonable to expect corroborating evidence for certain alleged facts pertaining to the specifics of an applicant’s claim, such evidence should be provided.” Dorosh v. Ashcroft, 398 F.3d 379, 382 (6th Cir.2004). Mamane more than met this standard by producing a copy of her MPPDHD identification card and an email message from MPPDHD stating that she worked as a teacher of women in rural villages, taught them literacy skills,[2] urged them to vote in elections and not to turn their votes over to their husbands, and encouraged them to send their daughters to schools. A.R. 345. The email from MPPDHD also discussed the police beatings of Mamane in February and March 2009, stated that a week after the March beating, two of Mamane’s coworkers disappeared, and further. stated that MPPDHD urged Mamane to leave Niger because her life was at risk. A.R. 345. That the MPPDHD email did not come directly from the organization’s president does not dimmish its corroborative value.
Mamane also submitted an email from her siblings discussing her work for MPPDHD and stating that she returned home after the police beatings in February and March 2009 “beaten, tortured, and humiliated.” A.R. 347. The IJ criticized this email for providing insufficient detail regarding Mamane’s injuries. Beyond that, the IJ disbelieved that the police beatings[3] occurred because of the incon-sisténcy between the medical records and Mamane’s testimony regarding her injuries and because of the similarity in Ma-mane’s descriptions of the two beatings.
As we observed in Slyusar v. Holder, 740 F.3d 1068, 1074-75 (6th Cir.2014):
[W]e wish to emphasize that “[although the REAL ID Act expands the bases on which an IJ may rest an, adverse credibility determination, it does not give a blank cheek to the IJ enabling him or her to insulate an adverse credibility determination from our review of the reasonableness of that determination.” Ren [v. Holder ], 648 F.3d [1079,] 1084 (9th Cir.2011) (quotation omitted). As the Ren Court recognized, “victims of abuse often confuse the details of particular incidents, including the time. or dates of particular assaults and which specific actions occurred on which specific occasion; thus, the ability to recall precise dates of events years after they happen is an extremely poor test of how truthful a witness’s substantive account is.” Id. at 1085-86 (internal citations and quotation marks omitted).
The Ninth Circuit in Ren further observed:
Although the REAL ID Act now gives immigration judges the power to consider any inconsistency in evaluating an applicant’s credibility, the power to consider any inconsistency “is quite distinct from the issue of whether the inconsistencies cited support an adverse credibility determination.” Shrestha [v. Holder], 590 F.3d [1034,] 1043 [ (9th Cir.2010) ]. (quoting Scott Rempell, Credibility Assessments and the REAL ID Act’s Amendments to Immigration Law, 44 Tex. Int’l L.J. 185, 206 (2008)). *888 [T]o support an adverse credibility determination, an inconsistency must not be trivial and must have some bearing on the petitioner’s veracity. Id, at 1044.
Ren, 648 F.3d at 1086.
Mamane testified that the doctor who attended her after the police beatings explained that because she reported that the police had beaten her he was obligated to notify the police. The medical reports submitted to the IJ state on their face that the local police chief ordered the exams. Both medical reports state that Mamane was a “victim of Voluntary Beatings and Wounds (CBV),” thus corroborating that Mamane reported the incidents and sought treatment; the first lists her injuries as “PURPURA due to nail scratching of the upper part of the thorax”; the second reports “general muscular pain.” It is not surprising that the reports ordered by the police in response to an accusation of police beatings would minimize Mamane’s injuries. Both the MPPDHD and Mamane’s siblings corroborated that Mamane was seriously injured by the two police beatings. Finally, that the two police beatings were similar is not implausible and as we have observed, “victims of abuse often confuse the details of particular incidents.” Slyusar, 740 F.3d at 1075 (quoting Ren, 648 F.3d at 1085-86).
The IJ also found further reason to doubt Mamane in the one-year discrepancy in her age as stated in the medical reports,[4] disregarding Mamane’s plausible explanation that many Africans add a year to their age once January of the year arrives.
Because the IJ’s adverse credibility determination rested largely on trivial inconsistencies, I would vacate the BIA’s decision affirming the IJ and remand.

. Mamane made two corrections to her asylum application before the merits hearing; that she was a volunteer, not a paid employee, for MICA, and that a second police beating occurred. Mamane testified that she told the person assisting her with her application of the second beating and he responded that there was insufficient space to include it. She also testified that she told the asylum officer. A.R. 182.

. As of 2008, the literacy rate for women in Niger was 17%.

. The Niger 2010 country report states that the police operate with impunity and disregard the law regarding arbitrary arrest and detention.

. The medical reports of February and March of 2009 both list Mamane’s age as 23, although she would actually have been 22, her birthday being October 15, 1986.