RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 16a0292p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

CONCERNED PASTORS FOR SOCIAL ACTION, et al.,
　　　　　　　　　　　　　　*Plaintiffs-Appellees,*

　　*v.*

No. 16-2628

NICK KHOURI, et al.,

　　　　　　　　　　　*Defendants-Appellants.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:16-cv-10277—David M. Lawson, District Judge.

Decided and Filed:  December 16, 2016

Before:  KEITH, SUTTON, and DONALD, Circuit Judges.

　　The court delivered a PER CURIAM order.  SUTTON, J. (pp. 5–13), delivered a separate dissenting opinion.

_____

**ORDER**

_____

　　The Treasurer of the State of Michigan and the members of the Flint Receivership Transition Advisory Board (jointly referred to as the "State Defendants") appeal a preliminary injunction requiring, among other things, the delivery of bottled water to non-exempt households served by the Flint water system.  They move to stay the injunction pending appeal.  Flint responds in support of the motion for a stay.  The Plaintiffs oppose the motion to stay.  The State Defendants filed a reply in support of their motion.  The district court denied a stay pending appeal on December 2, 2016.

1

As a preliminary matter, we grant the parties' motions to exceed the page limitations of Federal Rule of Appellate Procedure 27(d)(2). The Plaintiffs' motion to strike is granted because the State Defendants' reply brief raises an argument that was not raised in the motion for a stay, thus obviating the Plaintiff's need to file a sur-reply.

As the movants, the State Defendants "bear[] the burden of showing that the circumstances justify" the exercise of discretion to grant a stay of the preliminary injunction pending appeal. *Nken v. Holder*, 556 U.S. 418, 433–34 (2009). Four factors guide the court's consideration of the motion for a stay: (1) whether the State Defendants have a likelihood of success on the merits; (2) whether they will suffer irreparable harm in the absence of a stay; (3) whether the requested injunctive relief will substantially injure other interested parties; and (4) where the public interest lies. *Id.* at 434; *see also Ohio St. Conference of N.A.A.C.P. v. Husted*, 769 F.3d 385, 387 (6th Cir. 2014); *Serv. Emps. Int'l Union Local 1 v. Husted*, 698 F.3d 341, 343 (6th Cir. 2012). These four factors "are not prerequisites that must be met, but interrelated considerations that must be balanced." *In re EPA*, 803 F.3d 804, 806 (6th Cir. 2015).

The State Defendants' argument that the injunction is overbroad and lacks evidentiary support is based on the erroneous belief that the central component of the injunctive relief is the door-to-door delivery of bottled water. This is not the case. For homes that have properly installed water filters, bottled delivery is not ordered. It is only ordered for homes where there is no proper filter in place. For many without a proper filter, as the testimony demonstrates, obtaining drinking water is inaccessible due in part to the limited hours of the points of distribution and transportation issues. The likelihood of success on the merits is slim.

Furthermore, the State Defendants' disingenuous claim that the daily delivery of bottled water would be at an expense of $10.5 million a month, is not supported by the record. According to Michigan State Police Captain Christopher Kelenske, the $10.5 million figure is based on the idea that five cases of water would have to be delivered to anywhere from 30,000 and 34,000 homes in Flint each week, based on the number of homes that rely on the Flint water system. However, Captain Kelenske also testified that under his watch every home in Flint has been visited and 96% of homes have new water filters, and the remaining 1,000 to 1,500 homes may include some homes that are unoccupied. According to the State Defendants, the cost of

verifying the proper installation and maintenance of water filters is $955,971. The cost of verifying and maintaining water filters and delivering bottled water to residents that are not part of the allegedly 96% of homes that already have a functioning water filter is nowhere near $10.5 million. Additionally, there is still $100 million left of the $212 million that Michigan allocated to respond to the Flint water crisis. Therefore, the State Defendants will not suffer irreparable harm in the absence of a stay.

Flint residents continue to suffer irreparable harm from the lack of reliable access to safe drinking water. Many residents who rely on filters that are improperly installed continue to be at risk of exposure to lead. Compliance with the order only requires that the State Defendants deliver bottled water to homes until they ensure that a home has a properly installed and maintained water filter, or if the residents opt-out of the delivery service.

It is important to remember that there are still people in Flint that do not have access to safe drinking water. In the absence of this injunction, it is unclear how the State Defendants plan to ensure that every resident in Flint has safe drinking water. The State Defendants' contend that delivering bottled water to Flint residents will slow down the recovery of Flint's water system by significantly decreasing the amount of water moving through the Flint water system delivery lines. First, even where no effective water filter is in place, bottled water delivery would only replace a small fraction of household water use. According to the EPA, an average family of four uses 400 gallons of water per day, 70% of which is indoor usage that includes 26.7% toilet, 21.7% clothes washing, 16.8% shower, 15.6% faucet, 13.7% leaks, and $5.3% other. https://www3.epa.gov/watersense/pubs/indoor.html (last visited December 2, 2016).

Second, it cannot be overstated that it is an immediate requirement, under the Safe Drinking Water Act's (SDWA) Lead and Copper Rule that the State Defendants' provide safe drinking water to all residents of Flint. Although there may be no known precedent for the door-to-door delivery of bottled water, there is also no precedent for the systematic infrastructure damage to a water delivery system that has caused thousands of people to be exposed to poisonous water. The injunction is in place to ensure that those people have access to clean water. The injunction is tailored to the specific systemic harms found and is appropriate in scope. For those reasons, the stay of the preliminary injunction must be denied.

The State Defendants have not demonstrated a strong likelihood of success on their challenges to the findings that the Flint water system is not in compliance with various regulations promulgated under the SDWA. Nor have they shown that portions of the preliminary injunction, including the provisions requiring the delivery of bottled water to non-exempt households, are overbroad. Further, a stay does not support the public interest because the SDWA has already established that the provision of safe drinking water is an important public interest.

The motions to exceed the page limitations are **GRANTED**; the Plaintiffs' motion to strike is **GRANTED**. The State Defendants' motion to stay the preliminary injunction pending appeal is **DENIED**.

---

**DISSENT**

---

SUTTON, Circuit Judge, dissenting.  I can appreciate why the district court would be tempted to order daily deliveries of bottled water to thousands of residents of Flint, Michigan, at an estimated expense of $10.5 million a month.  And I can appreciate why my colleagues would be tempted to leave that order in place.  State and City officials endangered the health of many Flint residents by failing to monitor and limit the lead levels in the water supply.  And after the problem was identified in December 2015, it took some time for those same officials to acknowledge their mistakes.  Perhaps in that sense, it looks like these government officials had it coming to them—that they earned the costs and logistical challenges now imposed on them by the district court.

But I fear that the district court's unusual preliminary injunction will do more harm than good for the people of Flint and delay rather than expedite a solution to this problem.  I have two key concerns:  It's not clear that Flint's water violates federal law at this point and, even if it does, the order expedites the wrong thing by forcing government officials to prioritize weekly deliveries of bottled water over ensuring that the new filters provided to 96% of Flint residents work.

In the absence of a predicate finding of an *ongoing* violation of federal law, the district court ordered government officials to make the daily deliveries of bottled water *until* they could ensure that each filter worked.  That is no small task in a city of 100,000 people.  That means the door-to-door bottled-water deliveries must begin immediately with all of the monetary and logistical challenges associated with them (to say nothing of water-bottle-freezing temperatures), and continue until government officials prove each home has a working filter.  Perhaps there might have been something to such an order a year ago, when the problem was first discovered.  But at this point the City already guarantees water delivery for disabled and elderly residents, permits other residents to call a 211 hotline if they need water deliveries, and has nine sites around the city where residents can pick up all of the bottled water they need.  At this point, in

other words, the plaintiffs and defendants alike should focus on measuring current water quality and ensuring that each filter works. But that most assuredly will not happen in the face of this order, as the government officials point out and as no one (including the district court and my colleagues) can reasonably dispute given the logistical challenges of the court's order.

The court had other measured options at its disposal. Why not first order new tests of the current quality of the water to determine whether there is an ongoing violation of federal law? If the plaintiffs establish any ongoing violations, why not enter an order designed to fix those violations and ensure working filters, and then and only then threaten responsible officials with a requirement of bottled-water deliveries for all *if* the officials could not fix any problems within a reasonable period of time. That would have been a fair and proportionate way to focus everyone's attention. But the immediate, extensive, and costly requirements of this order run the serious risk of undermining its goal. For these reasons and those elaborated below, I would grant the stay and urge the district court to recalibrate its order to focus on testing and monitoring current water-quality levels and, if they remain wanting, prioritize efforts to ensure that the filters in each home are working.

I.

The people of Flint have been through a rough patch. In November 2011, Governor Rick Snyder placed the City in state-controlled receivership after declaring a financial emergency. At the time, the City received its water from the Detroit Water and Sewerage Department, the source of which is the Detroit River and Lake Huron. The City Council voted in March 2013 to save money by joining the Karegondi Water Authority, a newly formed water supply system that was not yet up and running. The Emergency Manager and the State Treasurer signed off on the contract with the Karegondi Water Authority. The Emergency Manager rejected Detroit's offer to renegotiate interim rates, and the City decided to take its water from the Flint River in the meantime.

That did not work. Flint had not treated the Detroit water for decades, and it neglected to add critical chemicals to the highly corrosive Flint River water, including orthophosphates, which "coat the pipes so that the water is not in direct contact with the metals to prevent the

leaching of those metals into the water." R. 86 at 215. The mistake ruined the water delivered to Flint residents. The tap water became discolored, smelled foul, and worst of all was dangerous to drink. By early 2015, the City, State, and EPA learned of high amounts of lead in the water. Data collected by Virginia Tech researchers showed that more than 10% of water samples in August 2015 contained more than 25 parts per billion of lead, well above the EPA action level of 15 ppb for the 90th percentile. 40 C.F.R. § 141.80(c)(1).

Flint switched its water source. It returned to the Detroit Water Department and began adding phosphates in December 2015 to repair the damaged chemical shield separating the lead from the water. Flint's mayor declared a state of emergency. On January 5, 2016, Governor Snyder declared a state of emergency and activated the National Guard.

By April 2016, the National Guard, the American Red Cross, and state and local emergency response teams had visited 21,291 homes and over 5,000 apartments in Flint, and had distributed 84,505 water filters, 195,264 filter cartridges, 153,005 cases of water, and 24,866 water test kits. The State and City established points of distribution at fire stations and churches where anyone could pick up filters, filter cartridges, bottled water, and test kits. Emergency response personnel eventually visited every residence in Flint, distributing at least one filter to everyone who was home and leaving a card with information about the 211 hotline at the rest. Anyone who calls the 211 hotline receives a one-time delivery of water and water filtration supplies. For anyone who is elderly, disabled, or otherwise unable to reach one of the nine points of distribution on a regular basis, the State adds the individual to the functional needs list and regularly delivers that person the bottled water they need. By mid-September 2016, the State and City had distributed 2.7 million cases of water (over 32 million liters), 136,000 filters (more than one for each of Flint's roughly 100,000 residents), 297,000 filter cartridges, and 54,492 water test kits.

Plaintiffs filed this lawsuit on January 27, 2016, one of dozens of lawsuits filed in response to the Flint water crisis. The plaintiffs in this case waited several months before requesting a preliminary injunction. The district court held a hearing in mid-September and issued a preliminary injunction on November 10, 2016. The crux of the district court's order is that the State and City "must confirm the number of residents in each household" in Flint "and

provide each household with four cases of bottled water per week per resident." R. 96 at 36. The only households exempt from the order are those that affirmatively opt out, that are permanently unoccupied, that refuse free faucet filter installation, or that the government ensures have a properly maintained and working filter. The last exemption is the key one at issue. The district court gave the State and City until December 16, 2016, to comply.

II.

The standard for granting a stay pending appeal is a familiar one. We look at four factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 426 (2009) (quotation omitted).

*Likelihood of success on the merits.* The legal underpinning of this lawsuit is the federal Safe Drinking Water Act and some regulations that the EPA has promulgated under it. The Act regulates "suppliers of water," defined as "any person who owns or operates a public water system." 42 U.S.C. § 300f(5). According to the record, the State, after placing Flint in receivership, began to "manage, direct, or conduct operations specifically related to" Flint's water safety. *United States v. Bestfoods*, 524 U.S. 51, 66 (1998). The State defendants had broad authority over the City's operations, *see* Mich. Comp. Laws. § 141.1549, and they apparently became responsible for switching the City's water source from the Detroit water authorities to the Flint River. The key regulation is known as the Lead and Copper Rule. It requires Flint to have "optimal corrosion control treatment" for its water system: Namely, treatment "that minimizes the lead and copper concentrations at users' taps while insuring that the treatment does not cause the water system to violate any national primary drinking water regulations." 40 C.F.R. § 141.2. The EPA's action level for lead is triggered when the amount of lead in the 90th percentile of water samples is at or above 15 ppb lead. 40 C.F.R. § 141.80(c)(1).

In its preliminary injunction decision, the district court claimed that two ongoing violations of the Safe Drinking Water Act justified relief: (1) a lack of optimal corrosion control, and (2) a failure to monitor lead levels properly.

*Absence of evidence of an ongoing legal violation.* The first source of legal authority for the injunction no longer exists. When it issued the preliminary injunction, the district court thought that Flint water was above the action level for lead and thought that this measurement amounted to a per se violation of the Act. R. 96 at 8. That is not the case. Exceeding the EPA-set action level is not necessarily a violation of the Act. *See* 40 C.F.R. § 141.81(b), (d). To its credit, the district court acknowledged its mistaken belief that 15 ppb was the maximum contaminant level for lead in its order denying a stay. 56 Fed. Reg. at 26,477. This consideration in other words no longer justifies the order. No less importantly, the most recent sampling data shows that "[i]t is likely" that Flint is now "meeting the lead action level." A.R. 24 at 7.

The EPA's monitoring requirement also cannot justify the injunction. The regulations require testing every six months at pre-designated high-risk sampling sites until the results fall below the action level for two six month periods. 40 C.F.R. § 141.86(a), (d). The district court thought the State was not in compliance with the monitoring requirements, possibly because Virginia Tech's data included sample sites that were not high risk. But the State has clarified the picture since then. Although it collects data from a larger sampling pool for its own purposes, its sampling also includes 120 high-risk sites, *more than the 60 required by the Lead and Copper Rule* for a city serving fewer than 1000,000 people and *more than the 100 required* for larger cities. *Id.* § 141.86(c). And the data from the high-risk sites suggests that the lead levels dropped below the action level even before the district court issued its order. As long as the State separates this data from the broader sampling pool, which it has been doing and will continue to do, it has complied with the monitoring requirements.

On this record, the State is in compliance with the Safe Drinking Water Act and the EPA's regulations. Until the plaintiffs can show an ongoing violation of these or other laws, the court has no basis for issuing injunctive relief.

*Absence of tailoring in connecting the injunction to alleged violations.*  Even if that were not the case, the State still would prevail in all probability.  Let's assume for the sake of argument that the legal premises of the district court's decision had been correct—that the State was still violating the Lead and Copper Rule's corrosion control treatment and monitoring requirements.  If so, that would have given the court authority to issue an order designed to remedy *those* violations.  Yet in ordering door-to-door water delivery and filter installation, it said not a word about monitoring or sampling methods.  A district court abuses its discretion where it fails to "fashion[] injunctive relief tailored to the identified harm."  *Northeast Ohio Coal. for Homeless v. Husted*, 696 F.3d 580, 599 (6th Cir. 2012) (per curiam).  The preliminary injunction was not "crafted . . . to the specific violations":  the corrosion control shortcomings and the failure to sample high-risk sites.  *Howe v. City of Akron*, 801 F.3d 718, 753 (6th Cir. 2015).  Before the district court "injected itself by injunctive decree" into these recovery efforts, it had a duty to ensure that its wide-ranging injunction would remedy ongoing violations of federal laws. *Rizzo v. Goode*, 423 U.S. 362, 380 (1976).

*Absence of proportionality in remedy.*  There is one other problem with the order.  To illustrate this defect, let's now assume two things:  that (1) the City and State are still violating these federal laws and (2) the district court mentioned these violations in its preliminary injunction order.  Even then, it's difficult to see how such a broad order could be upheld on appeal.  The door-to-door water delivery operation will cost at least $10.5 million per month, the cost of delivering bottled water to the 30,000 to 34,000 residences in Flint.  The State bears most of the costs for the delivery on the front end:  It must hire or train the large number of drivers needed to drive the trucks around town; and it must find warehouse capacity for 11.3 million liters of water.  The logistical challenge of delivering water to every residence in Flint, not the act of purchasing water bottles alone, makes door-to-door delivery unreasonable on this record and indeed contrary to the best practices recommended by FEMA, an agency that knows a thing or two about emergency relief.  *See* R. 86 at 310.

These costs come on top of the hundred million dollars the State has already spent in response to the crisis and the many changes it has already made.  The government has set up 9 points of distribution, one in each ward, in addition to supplying at least 42 faith-based groups

with water, filters, and supplies for distribution. The State and City have verified that 96% of homes (some were unoccupied at the time) have water filters. And any Flint resident can receive water by dialing 211. The functional needs program, operated out of a centralized warehouse that is too small to accommodate the district court's order, ensures that about 1,250 homebound households receive the water they need. The preliminary injunction would essentially expand the functional needs program to cover an additional 30,000 households—what amounts to a 24-fold increase in the size of the operation.

In denying the State's request for a stay of its decision, the district court thought these costs were a mere "chimera," R. 108 at 9, because 96% of Flint residents already have water filters. But the order requires weekly door-to-door water deliveries *until* the State and City ensure that *all* of the water filters are *working*—all while the government spends $10.5 million a month to make the deliveries. The preliminary injunction in other words forces the State to rely on the filter exemption for mandated door-to-door delivery. And to use the filter exemption, the State must "verify that a qualifying faucet water filter is installed and properly maintained." R. 96 at 35. Though the government has already verified that 96% of homes have filters, it must now "inspect each filter to ensure the filter and cartridge have been maintained properly and are functioning." *Id.* Even if Michigan spends $955,971 monthly to inspect every residence in Flint (and that's just how much it would have to spend on State employees, operators, and vehicles), the State will have to spend $10.5 million per month, or some roughly comparable amount, on the door-to-door operation for the first several months until it can finish exempting residences. It took three months to visit every house in early 2016, even after Governor Snyder activated the National Guard. Left as is, the preliminary injunction is apt to bring recovery efforts to a dead stop as the State and City divert resources to comply with it.

In this context, I cannot understand two aspects of my colleagues' position: (1) that the State has an "erroneous belief that the central component of the injunctive relief is the door-to-door delivery of bottled water" and (2) that the State raises a "disingenuous claim" that the delivery of bottled water will cost an estimated $10.5 million a month. As to the first point, the majority later in its opinion accepts the State's straightforward interpretation of the order: "Compliance with the order only requires that the State Defendants deliver bottled water to

homes until they ensure that a home has a properly installed and maintained water filter." A lot is being asked of the word "only." But that word cannot change what the November 10 order requires: door-to-door water bottle delivery to the 30,000 to 34,000 homes in Flint until the State confirms that the exemption applies. Neither the plaintiffs nor the majority nor the district court denies that it will take roughly $1 million and several months to determine which water filters work and which do not. Until then, the "central component" of the order will indeed be water bottle deliveries to each house. As to the second point, the source of the State's estimate is straightforward. There are 30,000 to 34,000 residences in Flint and a total population of around 100,000. The $10.5 million cost estimate per month turns on the estimated cost of delivering bottled water to that number of residences and the estimated number of individuals in each residence. That amount will of course diminish over time as the State confirms which filters work and which need to be fixed. But I cannot understand how the estimate is flawed as to the initial requirement of the preliminary injunction or how costs will not run in the many millions of dollars for two to three months. Notably, neither the plaintiffs nor the district court nor my colleagues offer a cost estimate of their own. I should have thought a prerequisite of any preliminary injunction imposed on a State or local government would be a finding by the court as to what it will cost.

The likelihood-of-success factor strongly weighs in favor of a stay.

*Irreparable injury.* There is little room for debate that the preliminary injunction creates one-and-done injuries to the State and City—an estimated $10.5 million a month and redeployment of workers toward short-term water delivery and away from long-term solutions. These non-recoverable losses of money, time, and resources strongly favor a stay.

*Injury to interested parties.* What matters to the plaintiff organizations and their members is that the State and City comply with federal law, reduce the amount of lead in Flint's water, improve sampling methods, and return the community to safe sources of drinking water. There are many reasons why the order does not serve these essential goals: It is not connected to ongoing violations of federal law; it does nothing to speed the gradual recoating of the pipes; it does nothing to improve monitoring; and above all its short-term focus on water deliveries will divert resources, time, and money from fixing what Flint needs fixing most: non-functioning or

improperly installed water filters. Notably, the record is barren of any proof of any instance in which any plaintiff (or any other organization) has identified a resident whom the State and City will not provide with water or filters. So too of residents with non-working filters: The record contains no evidence of anyone with such a filter who has asked for a repair and been denied. One caveat confirms the point: The State and City cannot do anything about organizations, such as Crossing Water, who claim such people exist but who will not identify them. This factor favors a stay.

*Public interest.* Because the State requests a stay, this inquiry merges into the other factors, with concern focused on how the district court's order will affect the people of Michigan. *Cf. Slyusar v. Holder*, 740 F.3d 1068, 1074 (6th Cir. 2014). An order unconnected to ongoing violations of federal law that prioritizes the wrong remedies—at a cost of $10.5 million a month—will do more harm than good for the community.

* * *

A dissent from an order upholding a district court's decision, I recognize, is not a likely place for a district court to look for advice. But, by all appearances, this case could benefit from a little more conversation between the parties and court. Everyone has the same interests in mind: delivery of safe water. Do the plaintiffs really want the State's and City's limited resources focused on immediate door-to-door delivery now as opposed to using that measure as a last resort if the defendants cannot ensure that the filters are working in, say, two or three months? And if the district court identifies ongoing violations of federal law, would the State and City really oppose door-to-door delivery as a backstop after they have been given a reasonable amount of time to identify which filters work and which do not? Reasonable people can disagree about a lot of things, but I wonder if this is one of them.

For these reasons, I respectfully dissent.

ENTERED BY ORDER OF THE COURT

Deborah S. Hunt, Clerk