NOT RECOMMENDED FOR PUBLICATION
File Name: 17a0261n.06

No. 16-4232

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| KANAPATHIPPILLAI THAYAPARAN, | ) | |
| | ) | **FILED** |
| Petitioner, | ) | May 08, 2017 |
| | ) | DEBORAH S. HUNT, Clerk |
| v. | ) | ON PETITION FOR REVIEW |
| | ) | FROM THE UNITED STATES |
| JEFF B. SESSIONS, U.S. Attorney General, | ) | BOARD OF IMMIGRATION |
| | ) | APPEALS |
| Respondent. | ) | |
| | ) | |
| | ) | |

BEFORE:     SUHRHEINRICH, WHITE, and STRANCH, Circuit Judges.

**SUHRHEINRICH**, Circuit Judge.  Petitioner Kanapathippillai Thayaparan (Petitioner) petitions for review of the Board of Immigration (Board) decision dismissing his appeal of an immigration judge's denial of asylum and related remedies.

## I.     BACKGROUND

Petitioner is a native and citizen of Sri Lanka.  He is a carpenter, is married, and has three children.  He applied for admission to the United States on September 3, 2015, without valid entry documents.  Upon expressing his fear of returning to Sri Lanka, Petitioner was given a credible fear interview by an asylum officer.  After being served with a Notice to Appear (NOA), Petitioner appeared with counsel, admitted the factual allegations in the NOA, and conceded he was subject to removal.  He applied for asylum, withholding of removal, and protection under the Convention Against Torture (CAT), claiming that he faced persecution and torture in Sri

Lanka on account of (1) his Tamil ethnicity; (2) the Sri Lankan government's mistaken belief that he was part of a Tamil rebel group known as the Liberation Tigers of Tamil Eelam (LTTE), a Tamil rebel group opposing the Sinhalese government; and (3) his status as a failed asylum seeker if he was to be denied entry and returned to Sri Lanka. Petitioner's asylum application (I-589 Form) included a Statement (Original Statement). AR 865-66.[1] Petitioner subsequently filed an Amended Statement (Amended Statement). AR 834.

*Petitioner's Version of Events*. Petitioner's claim was based on five separate incidents in Sri Lanka during which he claims he was arrested, beaten, and threatened. In 1993, a bomb exploded near the Mayura Amman Temple, killing a defense minister. Petitioner, who was working as a carpenter at the Temple, was suspected of being involved in the bombing because he was Tamil and thought to be a member of the LTTE. He and his coworkers were arrested and detained by the Criminal Investigation Department (CID). After detaining and torturing Petitioner for five months, the CID transferred him to a police station where he was detained and tortured for an additional fifteen days. A Temple administrator bribed the police, and Petitioner was released.

In 1996, Petitioner and his family were forced to flee from their hometown after the army captured it. While traveling to another town, Petitioner was arrested by the army after a masked man mistakenly identified him as a rebel also named Thayaparan, and held him at an army camp for twelve days. He was released after his wife and father-in-law paid a bribe.

---

[1] The Board Decision is found at AR 3-6. The immigration judge's decision is found at 83-126. The transcript of the immigration proceedings is found at 128-469. The credible worksheet is located at 470-84. Petitioner's Form I-589 is found at 852-66. His Amended Statement is found at 834-36.

In May 2009 Petitioner was arrested by the army again and held at a camp until January 14, 2011.

In 2014, a relative of Petitioner's maternal uncle came to his house for a visit. The visit triggered an investigation by the CID. Petitioner was briefly detained, and then released on the condition that he report to the local police station on the first Monday of every month and not leave the area. After three months, he stopped reporting because he feared he would be kidnapped and held for ransom.

On May 2, 2015, the CID came to Petitioner's house. They beat and kicked his wife and son, demanding to know where he was. Petitioner hid at his aunt's house until he was able to leave the country on May 15, 2015.

*The Immigration Judge's Decision.* Petitioner was the only witness to testify at his individual merits hearing. On April 13, 2016, the immigration judge found that Petitioner was not credible based on internally inconsistent testimony and inconsistencies between his testimony and other documentary evidence of record, including his credible fear interview. AR 110. The immigration judge also ruled on the underlying merits of Petitioner's claims, finding that the country condition information submitted by the government and Petitioner rebutted any showing of a well-founded fear of future persecution. AR 122-25. The judge noted that Petitioner was able to relocate several times, and resided safely at his aunt's house. AR 124. The judge denied protection under the CAT because Petitioner had not demonstrated a particularized threat of torture. AR 125-26.

*The Board's Decision.*[2]  On September 29, 2016, the Board upheld the immigration judge's credibility assessment as not clearly erroneous.  AR 3.  The Board held that, although each credibility concern, on its own, may not have been enough to render Petitioner not credible, when viewed as a whole, the totality of the circumstances supported the immigration judge's finding.  AR 5.  The Board also rejected Petitioner's argument that there was a pattern or practice of persecution against Tamils in Sri Lanka.  While the evidence showed that Tamils faced hardships in Sri Lanka, Petitioner had not met the very high burden of establishing a pattern or practice.  AR 5-6.  The Board next considered Petitioner's argument that a remand was warranted for the immigration judge to consider his claim that he will be persecuted or tortured on account of his membership in a particular social group comprised of "failed asylum seekers" returned to Sri Lanka.  AR 6.  The Board acknowledged the newspaper articles Petitioner submitted discussing how returned asylum seekers are considers traitors by the Sri Lankan government, but held that Petitioner had not shown that he is similarly situated to these individuals.  AR 6.  Lastly, the Board upheld the immigration judge's determination that Petitioner did not establish eligibility for asylum or withholding of removal, independent of the adverse credibility finding, and upheld the denial of Petitioner's CAT claim.  AR 6.  On December 13, 2016, the Board granted stay of removal.  Petitioner seeks review.

## II.    ANALYSIS

Petitioner presents several arguments.[3]  First, he claims that the immigration judge's and Board's (together "Agency") adverse credibility findings are not supported by substantial evidence.  Second, he claims that the Agency erroneously "transferred" adverse credibility

---

[2] The Board Decision was 2-1.  The dissenting member did not file a separate opinion.
[3] We have reordered the arguments.

findings to unconnected events. Third, he argues that the Agency erroneously held that he failed to establish a pattern or practice of persecution against Tamils in Sri Lanka warranting eligibility for relief. Fourth, he asserts that the Board erred in denying his claim for asylum or CAT protection as a failed asylum seeker. Fifth, he claims that the Agency erred in denying asylum and CAT protection based on an arrest warrant issued for him on July 22, 2015.

This court has jurisdiction to review the final decision of the Board affirming the immigration judge's denials of asylum, withholding of removal, and CAT protection. *Singh v. Ashcroft*, 398 F.3d 396, 400 (6th Cir. 2005). When the Board adopts the immigration judge's findings and adds additional comments, we review both the immigration judge's decision and the Board's "additional remarks." *Karimijanaki v. Holder*, 579 F.3d 710, 714 (6th Cir. 2009); *accord Zhao v. Holder*, 569 F.3d 238, 246 (6th Cir. 2009). We review legal conclusions de novo and factual findings and credibility determinations for substantial evidence. *Zhao*, 569 F.3d at 246. Although the substantial evidence standard is deferential, we are still obliged to give the Agency's decision a "hard look." *Marouf v. Lynch*, 811 F.3d 174, 181 (6th Cir. 2016) (citation omitted).

To qualify for discretionary asylum, Petitioner must show that he is unwilling or unable to return to his country of residence because of past persecution or a well-founded fear of future persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. 8 U.S.C. §§ 1158, 1101(a)(42)(A); 8 C.F.R. § 1208.13(b); *Marouf*, 811 F.3d at 179. To qualify for mandatory withholding of removal under the Immigration and Nationality Act, Petitioner must show past persecution or that "it is more likely than not" that he would be persecuted in the future on account of one of the enumerated grounds. 8 C.F.R. § 1208.16(b)(2); *see also* 8 U.S.C. § 1231(b)(3); *Marouf*, 811 F.3d at 179. To qualify for mandatory CAT

protection, Petitioner must show that "it is more likely than not" that he "would be tortured if removed" to Sri Lanka. 8 C.F.R. § 1208.16(c)(2); *see also Marouf*, 811 F.3d at 179.

## A. Credibility Determination

In this case the Board specifically upheld the immigration judge's negative credibility determination based on three separate issues: (1) inconsistent testimony and evidence regarding the 1996 arrest; (2) inconsistent statements regarding the 2015 incident; and (3) omissions regarding the 1993 detention. AR 3-5.

Under the REAL ID Act, credibility determinations are based on the "totality of the circumstances" and take into account "all relevant factors." 8 U.S.C. § 1158(b)(1)(B)(iii). This means that the immigration judge may base her credibility findings on any inconsistency "without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim, or any other relevant factor." *Id*.; *El-Moussa v. Holder*, 569 F.3d 250, 256 (6th Cir. 2009). The immigration judge is also allowed to evaluate credibility based on "demeanor, candor, or responsiveness," as well as "the inherent plausibility of the applicant's . . . account." 8 U.S.C. § 1158(b)(1)(B)(iii). It does not matter that we would decide the credibility question differently; such "determinations are conclusive unless any reasonable adjudicator would be *compelled* to make a contrary conclusion." *Slyusar v. Holder*, 740 F.3d 1068, 1073 (6th Cir. 2014) (emphasis added); *accord El-Moussa*, 569 F.3d at 256 (quoting 8 U.S.C. § 1252(b)(4)(A), (B)). In other words, "compulsion is required." *Slyusar*, 740 F.3d at 1073.

This credibility standard applies to claims for asylum, withholding of removal, and for relief under the torture convention. *Id.* at 1074.

*1996 Arrest and Detention.* As the Board acknowledged, Petitioner first testified that he met up with his mother and wife after his family fled their town, Vanni, and they traveled together to Vavuniya. AR 3-4; 228-29. Petitioner stated that he was trying to go to Colombo. AR 222. Petitioner's claim was inconsistent with his wife's statement. His wife said that Petitioner was travelling to Kilinochchi, not Colombo. AR 370-71. When confronted with his wife's inconsistent statement, Petitioner replied that his wife, who has lived in Sri Lanka all of her life, may not have known the names of the cities. AR 371, 380. Petitioner then testified that his wife and mother were in Kilinochchi (not Vanni) and that he "went for employment to Colombo through Vavuvuniya." AR 373. When the government attempted to clarify his story, Petitioner stated that his wife and mother did not leave Vanni with him but separately traveled to Vavuniya after learning that he had been arrested. AR 374-75. Petitioner also inconsistently testified as to whether his wife was detained in Vavuniya. AR 229 (his wife was detained); AR 369 (his wife was arrested when "she came in search of [him]"); AR 378 (his wife watched the army arrest him and "screamed and cried"); AR 647 (wife's statement; only Petitioner was arrested). The government then asked Petitioner to explain why he told the asylum officer that his wife and children met him in Vanni in 1996, despite the fact that his children were not born at that time. AR 388. Petitioner responded that he met his wife and mother in Kilinochchi after he went to Vanni. AR 388. Petitioner blamed the asylum officer for misrecording his statements. AR 389.

Petitioner acknowledges in his brief that his testimony is inconsistent, but does not attempt to explain or reconcile his story. Pet'r Br. 29. Rather, he states that his inability to recall precise dates of events decades later should not be dispositive on his credibility. This court has recognized that "victims of abuse often confuse the details of particular incidents," *Slyusar*,

740 F.3d at 1075 (quoting *Ren v. Holder*, 648 F.3d 1079, 1085 (9th Cir. 2011)), and we have "urge[d] the exercise of due care in evaluating such inconsistencies when reaching a credibility determination," *id.* But the REAL ID Act permits immigration judges to deny asylum applications based on inconsistencies that are unrelated to the claim itself. *Id.* at 1073 ("under the REAL ID Act, even ancillary inconsistencies in a petitioner's testimony support adverse credibility determinations"). Although we may not have viewed these discrepancies in testimony regarding a distant event the same way, we cannot say that the Agency's decision lacks support in the record. *Cf. Slyusar*, 740 F.3d at 1073 ("[W]hile another [immigration judge] might have ruled differently, we find that no evidence has been presented that compels a different ruling. We are thus bound by the decision of the [immigration judge] and the additional observations of the [Board].").

*The 2015 Questioning.* The record also supports the Board's conclusion that Petitioner offered inconsistent testimony concerning the 2015 incident. In his Amended Statement, Petitioner wrote that the CID beat both his wife and his son in 2015 when they came looking for Petitioner. AR 836. However, his wife's statement and his own testimony asserted that only his son was beaten. AR 648, 244. On appeal Petitioner claims that the inconsistency should not count against him because he did not witness the event, relying on a pre-REAL ID Act case. Again, although we may tend to agree with Petitioner, especially since it is undisputed that the CID beat his son, under the REAL ID Act the immigration judge is entitled to rely on such an inconsistency.

*The 1993 Incident.* First, the immigration judge noted that Petitioner testified on direct examination and in his Amended Statement that he was arrested and detained in 1993 because he was under suspicion of involvement in the bomb blast that killed a defense minister. However,

in his credible fear interview, he did not mention the bomb blast that killed the defense minister, the "precipitating event that gave rise to this very arrest in 1993." AR 112. Second, as the immigration judge and Board noted, Petitioner was specifically asked by the asylum officer whether he had ever been detained, and failed to mention that after being held for five months on the "fourth floor," a floor of the Sri Lankan intelligence department known for torture, he was transferred to the local police station and detained for an additional fifteen days. Third, he neglected to tell the asylum officer that people from the Temple had to pay money to get him out of jail, but included this fact in his testimony and amended statement. AR 113. The immigration judge rejected Petitioner's explanation that his emotional state allowed him to give only short answers during his credible fear interview. AR 113-15. Although we "are reluctant to sustain an adverse credibility finding on the grounds that an applicant's testimony during a credible fear assessment was not as complete as at the final hearing," *Toma v. Gonzales*, 189 Fed. App'x 492, 498 (6th Cir. 2006), the record reflects that Petitioner understood the process, received the assistance of an interpreter, and was given an opportunity to explain his story. *See*, *e.g.*, *Singh-Kaur v. Holder*, 575 F. App'x 770, 770 (9th Cir. 2014) (pre-REAL ID Act case upholding adverse credibility determination based on an inconsistency between the petitioner's testimony and his record of sworn statement). Moreover, given the other bases underpinning the adverse credibility finding, we express no opinion as to whether the omissions in the credible fear interview, standing alone, would be sufficient to sustain the adverse credibility finding.

*The bottom line*: Although we might deem some of the Agency's credibility findings as relatively inconsequential to Petitioner's asylum and related claims, they still serve as bases for an adverse credibility determination under the REAL ID Act standard. Thus, the Board's adverse credibility determination, which is supported by evidence, prevents any reliance on

Petitioner's testimony as evidence for his claims of asylum, withholding of removal, and CAT protection. *See* 8 U.S.C. § 1158(b)(1)(B)(ii) ("The testimony of the applicant may be sufficient to sustain the applicant's burden without corroboration, but only if the applicant satisfies the trier of fact that the applicant's testimony is credible. . . . In determining whether the applicant has met the applicant's burden, the trier of fact may weigh the credible testimony along with other evidence of record."). Because Petitioner's claim of past persecution depended almost entirely on his own testimony, and he does not argue on appeal that his other evidence of past persecution (in the form of statements by relatives) was independently sufficient, his claims for asylum and withholding of removal based on past persecution fail.

Notwithstanding, we wish to add a cautionary note. As we remarked in *Slyusar*, because the REAL ID Act allows immigration judges to deny asylum applications based on *de minimis* omissions or inaccuracies unrelated to the claim itself, immigration judges should "exercise . . . due care" when making credibility determinations. *See Slyusar*, 740 F.3d at 1075; *cf. Marouf*, 811 F.3d at 182 (REAL ID Act affords administrative fact finder broad discretion, but it does not "permit a judge to 'cherry pick' facts or inconsistencies to support an adverse credibility finding that is not supported by the record as a whole") (citation omitted). The immigration judge's zealous mining of some relatively inconsequential inconsistencies compels us to reiterate that concern here.

## B.     Transferred Credibility Determinations

Petitioner also contends that the Board improperly "transfer[red] adverse credibility determinations "to . . . unconnected independent event[s]." Pet'r Br. at 20. More specifically, he claims that the immigration judge's adverse credibility determinations as to the 1993, 1996, and

2015 incidents do not apply to the 2009 and 2014 incidents, which are independent events. Thus, the 2009 and 2014 incidents were proper grounds for granting asylum. This argument is unavailing because the adverse credibility determination extended to Petitioner's testimony about his experience in Sri Lanka and was not limited to three specific incidents. *See* AR 3-5; 110-21. The immigration judge clearly stated that the "not credible" finding was "[b]ased upon the totality of the circumstances and after considering all of the testimony and documentary evidence of record . . . ." AR 110. Furthermore, under the REAL ID Act, the Board was not required to confine an adverse credibility determination in such a manner. *See El-Moussa*, 569 F.3d at 256 (noting that inconsistencies need not go to the heart of the applicant's claim).

### C.      Future Persecution

Petitioner also challenges the Agency's rejection of his claim that he has a fear of future persecution. AR 5-6. Regardless of the adverse credibility determination, Petitioner can still demonstrate eligibility for asylum or withholding of removal if he can establish through other credible evidence that he has a well-founded fear of future persecution. 8 C.F.R. § 1208.13(b)(2). To be eligible for discretionary asylum, Petitioner bears the burden of establishing either that "there is a reasonable possibility he . . . would be singled out individually for persecution" on an enumerated ground if he returns to Sri Lanka, 8 C.F.R. § 1208.13(b)(2)(iii), or that "there is a pattern or practice . . . of persecution of a group of persons similarly situated" and that he is included within that group, 8 C.F.R. § 1208.13(b)(2)(iii)(A)(B). If Petitioner establishes the same but to the higher "more likely than not" standard, he is entitled to mandatory withholding of removal. *See* 8 C.F.R. § 1208.16(b)(2). Evidence of general unrest does not establish a fear of future persecution; the harm must be aimed at the applicant or his group. *See Almuhtaseb v. Gonzales*, 453 F.3d 743, 750 (6th Cir. 2006); *see also Vakeesan v.*

*Holder*, 343 F. App'x 117, 127 (6th Cir. 2009) ("[B]y finding that Vakeesan's evidence demonstrates only 'generalized civil strife' in Sri Lanka resulting from the civil war, the [Board] necessarily found that Vakeesan's evidence does not demonstrate a pattern or practice of persecution of innocent Tamils in Sri Lanka.").

The Board reviewed the immigration judge's factual findings and held that Petitioner had "not met the very high burden of establishing a pattern or practice against Tamils in Sri Lanka." AR 6. The Board acknowledged that the immigration judge "considered the serious problems and abuses perpetrated by the Sri Lankan government" and noted that "the evidence shows that Tamils face hardships in Sri Lanka," but found that they did not rise to the heightened level of demonstrating a pattern or practice of persecution against Tamils. *Id*. The Board did not reference any specific evidence, however.

The immigration judge found that the government rebutted any showing of a well-founded fear of future persecution based on country condition evidence submitted by both the government and Petitioner, namely the United States Department of State Country Reports on Human Rights Practice for 2014 ("2014 Country Report"). *See* AR 670-97. Noting that Petitioner's "entire claim" is based on harm inflicted by government forces, the immigration judge pointed out that the 2014 Country Report indicates that the authorities "maintained effective control over the security forces" during the 2010 elections. AR 122. The immigration judge acknowledged that the report discussed other serious problems, including unlawful killings by security forces and government-allied paramilitary groups in Tamil-dominated areas and that the Sri Lankan government is engaged in ongoing conflict with the LTTE. AR 122. Despite this, the immigration judge held that the "unfortunate political landscape" would not result in Petitioner having a fear of returning to Sri Lanka, because many of the articles dealt with

upheaval from 2009-2012 and Petitioner's own articles stated that the United Nations "is actively engaged in having Sri Lanka take steps to ensure accountability for alleged war crimes." AR 123. Further, although some articles raised concerns regarding the 2015 presidential election and torture accounts, this did not establish that Petitioner would be persecuted for his perceived involvement in the LTTE if he returned. AR 123.

Yet, as the immigration judge observed, the 2014 Country Report also stated that "[t]he major human rights problems reported over the year were attacks on, and harassment of, civil society activists, journalists, and persons viewed as sympathizers of the . . . [LTTE] by individuals allegedly tied to the government; involuntary disappearances, arbitrary arrest and detention, torture abuse of detainees . . . and widespread impunity for a broad range of human rights abuses." AR 670. The 2014 Country Report's finding regarding the government's control over the security forces is limited to the 2010 elections. AR 670. The 2014 Country Report also stated that "[d]iscrimination against . . . the ethnic Tamil minority continued, and a disproportionate number of the victims of human rights abuses were Tamils." AR 670. The report also indicates that "Tamils throughout the country, but especially in the north and east, reported that security forces and paramilitary groups frequently harassed young and middle-aged Tamil men." AR 694.

Other documents, which the immigration judge seemingly glossed over, suggest a continued pattern or practice of persecution against Tamils and sympathizers of LTTE. For example, a resolution passed by the Northern Province Council ("Resolution") "provides an overview of the evidence demonstrating successive Sri Lankan governments' genocide against Tamils," and urges the United Nations Office of the High Commission for Human Rights Investigation on Sri Lanka (OISL) "to investigate the claim of genocide and recommend

-13-

appropriate investigations and prosecutions by the International Criminal Court." AR 733. The Resolution references a report issued in March 2014 by an expert who contributed to the Secretary-General's United Nations Report, concluding that abduction, arbitrary detention, torture, rape, and sexual violence have increased since 2009 and that "[t]hese widespread and systematic violations by the Sri Lankan security forces occur in a manner that indicates a coordinated, systematic plan approved by the highest levels of government." AR 738. The report "found 'a pattern of targeting Tamils for abduction and arbitrary detention unconnected to a lawful purpose, involving widespread acts of torture and rape.'" AR 738. The Resolution found that the report "paints a chilling picture of the continuation of the conflict against the ethnic Tamil Community with the purpose of sowing terror and destabilizing community members who remain in the country." AR 738. The Resolution concludes that "[t]o this day, Tamils in the NorthEast suffer from Sri Lanka's ongoing genocide." AR 743.

A Freedom from Torture report ("FFT Report") by the Medical Foundation for the Care of Victims of Torture, dated January 5, 2016, one year after the January 5, 2015 presidential election in Sri Lanka, noted that the Foundation has continued to receive numerous referrals for people tortured in Sri Lanka, and warned that "the Government must place a higher priority on tackling torture by the country's military, police and security services." AR 554. The FFT report quotes Sonya Sceats, Director of Policy and Advocacy, who stated that: "We have medical evidence of torture by the Sri Lankan military and intelligence services since [the new president] came to power, which suggest that an abusive 'deep state' is still terrorizing communities and impeding Sri Lanka's post-war revival." AR 555.[4]

---

[4] Interestingly, the report states that two of the survivors identified a notorious camp run by the military in Vavuniya as a torture facility, and "[o]thers reported torture facilities included in the

The International Truth and Justice Project on Sri Lanka Report ("ITJP Report"), dated January 2016, states that despite the Sri Lankan government's promise at the Human Rights Council in Geneva in September 2015 to deliver post-war accountability, "[h]uman rights violations by the security forces continue with impunity and a predatory climate against Tamils prevails." AR 565. The report documents abductions and unauthorized detentions of twenty Sri Lankan Tamils all occurring after the January 2015 presidential elections. AR 568. It explains that the victims "were abducted in targeted pre-planned operations. There was nothing random or opportunistic about the security forces' actions." AR 569. It states that some of the 2015 victims were targeted "[t]o deter them and other Tamils from exercising their legitimate, democratic political rights," and some "[a]s a form of post-war ethnic cleansing in order to make their life so fearful and unbearable, . . . that they flee the country." AR 569. An additional listed reason is "[p]ersecution." AR 569. In its conclusion, the ITJP Report states that the twenty documented cases

> reveal not only that torture and oppression continue in Sri Lanka but that they remain widespread and systematic. They are the work of a well-organised machine which continues to thrive within the Sri Lankan police and military fueled by extortion. It is responsible for terrorizing and oppressing Tamils. This is therefore not a question of a few rotten apples in the system, as the new government suggests, but rather the result of structures that have long been corrupted.

AR 593.

In short, these articles tend to undermine the immigration judge's finding that the United Nations' attempts to reform the Sri Lankan government's approach to terror and torture have been effective and they require a closer inspection upon remand. *See generally Marouf*,

---

fourth floor headquarters of the Criminal Investigation Department in Colombo and a makeshift jungle camp . . . ." AR 555. This information resembles Petitioner's account.

811 F.3d at 187 (holding that the immigration judge "impermissibly 'cherry-pick[ed]' a general statement that was belied by more specific and relevant evidence in the same report"). Granted, the Report of the Office of the United Nations High Commissioner for Human Rights on Promoting Reconciliation, Accountability and Human Rights in Sri Lanka dated September 16, 2015 stated that the new president of Sri Lanka has pledged in public statements a need for justice for all citizens. AR 702, 709, 712. But it is otherwise a scathing account of continuing human rights abuses in Sri Lanka. *See* AR 702-03 (stating that the new government has yet to "embark on any comprehensive process of demilitarization," and that torture and sexual violence remain a critical concern), 704-09.

We recognize that Petitioner provided "a plethora of information regarding problems that are occurring in Sri Lanka." AR 123. However, Petitioner's alternate ground for asylum or withholding of removal deserved the same vigorous attention the immigration judge accorded to the credibility determination. The Board's summary endorsement of the immigration judge's reasoning added nothing to this analysis. The foregoing examples appear to support an objectively reasonable fear of future persecution based on Petitioner's Tamil ethnicity, and his ethnicity is not disputed. Because the agency failed to give "reasoned consideration" to Petitioner's application for asylum or withholding of removal based on a well-founded fear of future prosecution, and we are "unable to review the evidence in the first instance," we vacate the order denying the petition for review and remand for further proceedings. *See Gaksakuman v. U.S. Att'y Gen.*, 767 F.3d 1164, 1170, 1171 (11th Cir. 2014) (internal quotation marks and citations omitted) (holding that the Board failed to give "reasoned consideration" to the petitioner's application for asylum based on documents supporting his status as an failed asylum seeker in Sri Lanka); *see also Ruiz-Del-Cid v. Holder*, 765 F.3d 635, 639 (6th Cir. 2014)

(holding that if the Board fails to adequately explain its reasoning, the court of appeals should not try to correct the deficiencies but should remand for further analysis). After examining these materials, the immigration judge may ultimately reach the same conclusion. But a more detailed analysis is required to facilitate appellate review.

Alternatively, Petitioner may also show an individualized fear of future persecution by offering "specific information showing a real threat." *Dieng v. Holder*, 698 F.3d 866, 872 (6th Cir. 2012); *see also* 8 C.F.R. 1208.13(b)(2)(iii). We think that the arrest warrant may suffice. On July 22, 2015, an arrest warrant was issued for Petitioner under the Prevention of Terrorism Act ("PTA"). AR 656-57.[5] The 2014 Country Report indicates that the PTA gives security forces "sweeping powers to search, arrest, and detain" often "for prolonged periods without charge." AR 677. The PTA "has attracted universal condemnation ever since it was enacted," because it "encourages the pervasive violation of human rights" and "has been deployed to . . . inflict physical harm and mental distress" on Sri Lankans. AR 611. In a September 2015 report, the Office of the United Nations High Commissioner for Human Rights in Sri Lanka suggested its repeal. AR 715. Yet the record indicates that it remains in force. AR 713.[6]

The immigration judge did not make any finding regarding the arrest warrant and the Board does not mention it. This also leads us to conclude that the Agency failed to give "reasoned consideration" to Petitioner's asylum or withholding of removal claims based on a

---

[5] The arrest warrant is not fully translated. But the relevant portion is translated to state: "Charges against under the prevention of Terrorism Act. 427." AR 656.

[6] An article from the Global Legal Monitor, by Constance Johnson, "Sri Lanka: New Terrorism Law Being Drafted," dated November 22, 2016, states that the Sri Lankan government is drafting new anti-terrorism legislation to replace the existing Prevention of Terrorism Act. Constance Johnson, *Sri Lanka: New Terrorism Law Being Drafted,* LAW LIBRARY OF CONGRESS, (Nov. 22, 2016), http://www.loc.gov/law/foreign-news/article/sri-lanka-new-terrorism-law-being-drafted/

fear of future persecution requiring a remand for review of the evidence in the first instance. *See Gaksakuman*, 767 F.3d at 1171. The government responds that the document is not relevant because it does not specify that Petitioner "will be indefinitely detained, charged, tortured." Resp't Br. 34. But we think it very unlikely that the government would telegraph its intent to commit human rights abuses on the face of a warrant.

The immigration judge's other reasons for denying Petitioner's asylum and withholding of removal claims based on a fear of future persecution do not save the Agency's order. The immigration judge found that the government rebutted any showing of a well-founded fear of future persecution because Petitioner "was able to remain at his aunt's house before his departure from Sri Lanka for a period of time" without harm, and his wife and children remain in Sri Lanka safely. AR 124. Further, Petitioner himself was able to live in various places and work despite the alleged acts of harm in 1993, 1996, 2009, and 2014. AR 124. The immigration judge's logic is problematic. First, Petitioner stated that he had no problems at his aunt's house because he did not go out. AR 99. And "the period of time" he remained there was only thirteen days. This is slim evidence of a safe environment. Second, Petitioner, as a middle-aged Tamil male, is not similarly situated to his wife and children; indeed the evidence suggests that Tamil males are the primary target of the armed forces. (Besides, Petitioner and his wife agreed that their son was beaten, undermining the immigration judge's assertion that Petitioner's children are safe.) Third, the immigration judge merely conjectured that Petitioner could safely relocate to another part of the country and also did not find that it would be reasonable to expect the applicant to do so under all the circumstances. 8 C.F.R. § 1208.13(b)(1)(i)(A), (B). In short, at this juncture these proffers do not refute Petitioner's fear of future persecution.

### D.      Failed Asylum Seeker

The Board also rejected Petitioner's claims for asylum, withholding of removal, and CAT protection based on his status as a "failed asylum seeker." The immigration judge did not address this argument.[7] The Board did, noting that Petitioner "submitted newspaper articles discussing claims that some asylum seekers who traveled by boat to Australia were detained and suffered mistreatment upon return to Sri Lanka," but ruled that Petitioner had not shown he was similarly situated to those individuals. AR 6.

We disagree. Petitioner submitted several documents pertaining to the arrest, detention, and torture of returned asylum seekers, and not just those returning from Australia. AR 781-801. More to the point, Petitioner is similarly situated because they are all "failed asylum seekers" and most are Tamil. The method of transport for departure is not the defining characteristic of the group. For example, an Amnesty International report from 2011 states that the Sri Lankan government "ha[d] a history of arresting and detaining Sri Lankan asylum seekers upon their return and we are aware of cases of people being tortured." AR 791. Another document quotes an official of the Catholic Church's Edmund Rice Centre as saying, "The difficulty here is that there is a view in Sri Lanka that anybody who left the country through an unauthorised manner, of unauthorised means, is an LTTE sympathizer[.]" AR 793. For that reason, "sending them back is sending them back into danger." AR 794. More recently, an article in the Colombo Telegraph dated March 21, 2014, states that since the civil war ended in 2009, the Sri Lankan government has developed an extensive surveillance and intelligence system that targets Tamils returning to Sri Lanka, who upon returning have "become victims of abductions, arbitrary

---

[7] The government contends that Petitioner did not make this claim until closing argument. It is, however, presented in Petitioner's memorandum of law to the immigration judge, AR 912-13, and the Board addressed it.

-19-

detentions, torture and sexual violence." AR 755. The article states that five years after the end of the civil war, the Sri Lankan government "regards every Tamil in the North and East as a potential LTTE suspect" and that "[i]ts practices are neither consistent with the government claims of reconciliation or its assertions as to the respect of human rights." AR 755.

Two of these reports are mentioned in the Eleventh Circuit's opinion in *Gaksakuman*.[8] There, the Eleventh Circuit held that the evidence tended to prove that failed asylum seekers were at the risk of being detained and tortured regardless of whether they were actually Tamil with ties to the LTTE. *Gaksakuman*, 767 F.3d at 1170. The *Gaksakuman* court examined a number of documents, which "tended to prove that officials in Sri Lanka tortured at least some failed asylum seekers, particularly if they had an actual or perceived association with the Liberation Tigers." *Id.* Because the Board failed to give "reasoned consideration" to the petitioner's application, the case was remanded for further proceedings to determine whether he was likely to suffer torture if returned to Sri Lanka as a failed asylum seeker. *Id.* at 1171.

We think the same course of action is in order here. On remand we ask that the Board provide a more careful and accurate explanation of its conclusions based on all of the evidence submitted by Petitioner. *See Gaksakuman*, 767 F.3d at 1171 (remanding for further proceedings because appellate court was "'unable to review' the evidence in the first instance"); *Tan v. U.S. Att'y Gen.*, 446 F.3d 1369, 1377 (11th Cir. 2006) (holding that the immigration judge did not give "reasoned consideration" to petition for withholding of removal and his findings were inadequate). Although this court has held that the Board "has no duty to write an exegesis on every contention," *Scorteanu v. INS*, 339 F.3d 407, 412 (6th Cir. 2003) (citation omitted), it is

---

[8] Curiously, the government does not mention, let alone address, *Gaksakuman*, despite the fact that Petitioner cites it in his brief. *See* Pet'r Br. 12 (quoting his brief to the Board). The Board in its decision also did not address *Gaksakuman*.

required to consider all the evidence submitted by the petitioner, *see Tan*, 446 F.3d at 1376, and to "announce its decision in terms sufficient to enable a reviewing court to perceive that it has heard and thought and not merely reacted," *Scorteanu*, 339 F.3d at 412 (citation omitted).

## E. Arrest Warrant

Petitioner has offered evidence in the form of the arrest warrant pursuant to the PTA issued against him shortly after he left Sri Lanka.  As noted, the immigration judge made no fact findings regarding the arrest warrant.  For this reason remand for further consideration of Petitioner's claims based on this evidence is appropriate.

## III.    CONCLUSION

For the foregoing reasons, we **GRANT** the petition for review as to Petitioner's claims for asylum, withholding of removal, and CAT protection based on a fear of future persecution, **VACATE** the order of the Board, and **REMAND** for further proceedings consistent with this opinion.