NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0127n.06

No. 24-3328

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

Mar 05, 2025

KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| ZULEIMA IBARRA-RODALLEGAS; N.A., | ) | |
| Petitioners, | ) ) | ON PETITION FOR REVIEW |
| v. | ) | FROM THE BOARD OF |
| | ) | IMMIGRATION APPEALS |
| PAMELA BONDI, Attorney General, | ) | |
| Respondent. | ) ) | OPINION |
| | ) | |

Before: CLAY, GIBBONS, and STRANCH, Circuit Judges.

**CLAY, Circuit Judge.** Petitioners Zuleima Ibarra-Rodallegas and her minor child, N.A., seek review of the Board of Immigration Appeals' ("BIA") dismissal of their appeal of an immigration judge's ("IJ") denial of their applications for asylum, withholding of removal, and protection pursuant to the Convention Against Torture ("CAT"). For the reasons set forth below, we **DENY** the petition for review.

## I.      BACKGROUND

Ibarra-Rodallegas is a native and citizen of Colombia. She was a permanent resident of Mexico on or about March 15, 2022, when she illegally entered the United States with her one-year-old daughter, N.A. N.A. is a native and citizen of Mexico.

After the Department of Homeland Security ("DHS") charged her with removability, Ibarra-Rodallegas filed timely applications for asylum under Section 208(b)(1)(a) of the Immigration and Nationality Act ("INA"), withholding of removal under Section 241(b)(3) of the

Act, and relief under the Convention Against Torture pursuant to 8 C.F.R. § 1208.16. N.A. is a derivative beneficiary of Ibarra-Rodallegas's asylum application.[1] *See* 8 U.S.C. § 1158(b)(3)(A).

Pursuant to the DHS's issuance of a Notice to Appear, Ibarra-Rodallegas first appeared before an IJ pro se on June 23, 2022, and on September 12, 2022, appeared with counsel and conceded removability. The IJ designated Colombia as the country of removal and Mexico as an alternate country of removal.

Ibarra-Rodallegas claims asylum and withholding of removal due to her fear of persecution in Colombia for her political opinion, her fear of persecution in Mexico because of her nationality and her membership in the particular social group ("PSG") of victims of domestic violence, and her fear of persecution in both countries due to her race and gender. Ibarra-Rodallegas's claim for CAT protection is based on her fear that the government of Colombia would acquiesce to torture committed against her by the rebel group Revolutionary Armed Forces of Colombia ("FARC"), and that the government of Mexico would acquiesce in torture committed against her by her ex-partner, Javier Herrera.

## A. Ibarra-Rodallegas' Testimony and Other Evidence

The IJ held a removal hearing at which Ibarra-Rodallegas was the only witness. She testified in Spanish through an interpreter. The IJ deemed Ibarra Rodallegas's testimony not credible. We recount Ibarra-Rodallegas's testimony below, along with other evidence she submitted in support of her claims.

Ibarra-Rodallegas lived in Colombia until 2007, when she relocated to Mexico. She briefly returned to Colombia in December 2017. She then left Colombia in April 2018, staying in Spain

---

[1] In view of the derivative nature of the minor child's application for asylum, we refer to Petitioners collectively as "Ibarra-Rodallegas."

for seven months on a tourist visa. Ibarra-Rodallegas moved back to Mexico in November 2018 and resided there until entering the United States, save for a brief return to Colombia between December 2018 and January 2019. At some point, she attained permanent residency status in Mexico.

Ibarra-Rodallegas is unmarried. She has two children, both Mexican nationals with Mexican fathers. Ibarra-Rodallegas's older child resides in Colombia. Her younger child, N.A., lived with her in Mexico and came with her to the United States.

Ibarra-Rodallegas is Black. In Colombia and Mexico, she suffered discrimination due to the color of her skin, leading to difficulties in obtaining employment. In addition, when she worked in Mexico, she "was never able to have the same rights" as Mexican nationals, because she was only a permanent resident. Administrative Record ("AR"), R. 5-2, Page ID #138.

In Colombia, Ibarra-Rodallegas was a member of the Community Council of the Black Community of Bajo Calima (the "Council"). Ibarra-Rodallegas testified that she had been a member of the Council since 2002 and remained active in the group. To that end, she submitted a letter from the Legal Representative of the Council, dated January 12, 2023, as an exhibit to her application for asylum. The letter states, as translated from Spanish, that Ibarra-Rodallegas is "an active member of the Community Council of the Black Community of the Lower Basin of the Calima River and resides in the Community of Ceibito." *Id.* at Page ID #216. The government questioned Ibarra-Rodallegas about this letter on cross-examination, asking why the Council believed she lived in Ceibito, when she had not lived in Colombia since 2019. Ibarra-Rodallegas explained that she previously resided in the small community of Ceibito, including when she returned to Colombia in 2017. However, she stopped "going there" after receiving threats. *Id.* at Page ID #160. She believed the letter was "saying that [she was] from that community" and "a

3

leader in [that] community." *Id.* at Page ID #161. Ibarra-Rodallegas further explained that the intent of the letter was to establish that she is part of the Council, that she "lived or live or [is] part of the community of Ceibito," and that she "give[s] [her] opinions about things there." *Id.* at Page ID #166.

According to Ibarra-Rodallegas, the Council "gave [their] opinion," and did humanitarian aid work in the local community, including "help for the educational and medical sectors, help for pregnant women, for the elderly, [and] for children in school[.]" *Id.* at Page ID #141. The Council also did work to "[p]rotect the environment," and "right now" was "working on a project to prevent illegal farms and heavy equipment [and] heavy machinery." *Id.* The group also "[c]onstruct[ed] residences and help[ed] set[] up irrigation" systems. *Id.*

Ibarra-Rodallegas testified that she was discriminated against for her political opinion as a member of the Council. When she "would give [her] opinion about what could be done in [her] sector," she "received a lot of threats, and at one point [she] was at risk of death." *Id.* at Page ID #139. Ibarra-Rodallegas received threats from "[t]he guerilla, the FARC, the paramilitary" and "people that were in armed conflict" in her territory in Colombia. *Id.* She stated that she received threats from FARC because of her membership in the Council. FARC opposed the work of the Council "[b]ecause [FARC] want[ed] to manage at their will all of the resources that get to the community for community benefit." *Id.* at Page ID #141–42.

According to Ibarra-Rodallegas, her cousin and cousin's wife were brutally murdered in January 2017 because of their membership in the Council. She knew that her cousins were murdered due to their involvement in the group because FARC took responsibility for the murders, and "told us it was them and the same thing would happen to us and anyone else that didn't do what they wanted." *Id.* at Page ID #142.

4

Ibarra-Rodallegas was living in Mexico when her cousin was murdered. She decided to return to Colombia in December 2017 because the armed conflict between the government and FARC was ending, and she believed that "things were calming down." *Id.* at Page ID #144. But upon her return to Colombia, she discovered that "things [were] worse," there were "more groups, more threats," and the "threats [were] getting worse." *Id.* at Page ID #144. When Ibarra-Rodallegas was in Colombia, she was threatened "to leave or the same thing was going to happen to [her] that happened to [her] cousin." *Id.*

On cross-examination, the government asked Ibarra-Rodallegas if she was aware that the Colombian government had reached an agreement with FARC. She responded "[u]ntil now, no." *Id.* at Page ID #163.

Ibarra-Rodallegas traveled to Spain in 2018 and returned to Mexico thereafter but stated in an affidavit attached to her asylum application that she intended to permanently relocate back to Colombia in 2019. However, she testified that she abandoned her plan of relocating back to Colombia after she was threatened by gunmen pursuing her brother, a former police officer. Ibarra-Rodallegas's brother captured a criminal that was "linked to a gang that had links with the police." *Id.* at Page ID #243. Associates of the arrested criminal pursued the brother and targeted Ibarra-Rodallegas's family. This led to a confrontation in January 2019 while Ibarra-Rodallegas was in Colombia. Ibarra-Rodallegas encountered two gunmen in her parents' home and was shot at as she fled to a neighbor's residence.

Ibarra-Rodallegas testified to her relationships with her daughters' fathers, who were both Mexican. When she resided in Mexico prior to 2019, she was in a relationship with her older

daughter's father, Gerardo Cruz Guzman.[2]  Guzman psychologically and physically abused her.  In one incident, Guzman choked Ibarra-Rodallegas.  Ibarra-Rodallegas was able to yell, getting the attention of a neighbor, who called the police.  Ibarra-Rodallegas filed a police report on the incident, which occurred in 2015.[3]  Guzman is deceased; according to Ibarra-Rodallegas, he was murdered by organized crime in Monterrey, Mexico.

When she returned to Mexico in 2019, Ibarra-Rodallegas began a relationship with Javier Leandro Del Angel Herrera, N.A.'s father.  She testified that this relationship was also psychologically and physically abusive.  Herrera struck Ibarra-Rodallegas on three occasions between 2021 and 2022.  He would also use his brother's status as a lawyer to scare her and threatened not to sign N.A.'s passport so that Ibarra-Rodallegas would be unable to take N.A. to Colombia.  The "last time" Herrera insulted Ibarra-Rodallegas, "[h]e said nigger son of a bitch, let the devil take you."  *Id.* at Page ID #150.

Ibarra-Rodallegas did not report Herrera's acts of abuse to the Mexican police.  On cross examination, she initially stated that she failed to report the abuse out of fear.  She was scared of Herrera "[b]ecause he would threaten [her] that since his brother was a lawyer he would make sure that [she] would not be able to take [her] daughter" from Mexico.  *Id.* at Page ID #155.  She then stated that there were no police to report to in Nuevo Laredo, where the couple was living.  But when the government asked her if she had "any proof that there are no police in that part of Mexico," Ibarra-Rodallegas replied "[t]here could possibly be . . . police," but that she did not think that the Nuevo Laredo police would pay attention to her.  *Id.* at Page ID #156.  Ibarra-

---

[2] Gerardo's last name is provided as Quiroz in a police report exhibit, but he is referred to in the amended asylum application as Gerardo Guzman, so we adopt that nomenclature.

[3] A translated copy of the police report and related records were submitted as an exhibit to Ibarra-Rodallegas's asylum application.

Rodallegas later left Neuvo Laredo to go to Ciudad Juarez. However, she did not report the abuse in Ciudad Juarez either, because she was not living with Herrera and "didn't think there was going to be any more abuse during that time." *Id.* Neither of Ibarra-Rodallegas's two asylum applications contained information about Herrera's abuse. She explained that she omitted the information because she was still afraid to report the abuse, and feared that "if [she were] returned to Colombia or returned to Mexico [Herrera] w[ould] find [her], and [she doesn't] want to have anything to do with him." *Id.* at Page ID #157–58.

Ibarra-Rodallegas testified that she left Mexico for the United States because she was "running from being persecuted by the organized crime in New Laredo." *Id.* at Page ID #151. On this issue, Ibarra-Rodallegas's affidavit is more detailed than her scant testimony. In the affidavit, Ibarra-Rodallegas states that she and Herrera began selling cars through ads on social media. The Northeast Cartel discovered the ads and attempted to extort the couple, ordering Herrera to either pay them $9,000 or work for the cartel. Fearing for her safety, Ibarra-Rodallegas first moved within Mexico with N.A., then crossed the border into the United States after Herrera's brother advised her that the situation with the cartel was getting worse. She testified that she fled to the United States, rather than Colombia, because she desired greater safety for her children.

In addition to the police report, affidavit, and letter from the Council mentioned above, Ibarra-Rodallegas submitted further "corroborative evidence" in support of her claims. *Id.* at Page ID #265. This evidence included statements from Herrera's brother, Jorge Ruiz del Angel, and Ibarra-Rodallegas's father, Edgar Ibarra; as well as an article reporting on the deaths of Ibarra-Rodallegas's cousin and his partner.

Del Angel's statement detailed an incident that occurred in May 2022, after Ibarra-Rodallegas left Mexico. Herrera, a truck driver in Neuvo Laredo, was pursued in his truck at

7

gunpoint by armed criminals who led him in a car chase down a highway, shooting at him. Del Angel called the National Guard, and Herrera was able to reach safety at a miliary checkpoint, though he is now in hiding.

Ibarra's statement described Ibarra-Rodallegas as a "social leader[]" in the Council. *Id.* at Page ID #274. In that role, "she received death threats" because she did not "make a pact with the guerilla groups." *Id.* Ibarra's nephew and his wife, also social leaders, were tortured to death, and Ibarra-Rodallegas took refuge with her parents. Ibarra-Rodallegas then had to flee because she received death threats from gang members associated with her brother's work as a police officer, who stated that if her brother "did not return [to Colombia] and . . . show his face," Ibarra-Rodallegas and her family members would "face the consequences." *Id.*

The article on the deaths of Ibarra-Rodallegas's cousin and his partner, "Life and Death in Buenaventura," details that, as Ibarra-Rodallegas testified, the couple was kidnapped and brutally killed in January 2017. *Id.* at Page ID #284. But other details fail to corroborate Ibarra-Rodallegas's testimony. The article identifies the partner of Ibarra-Rodallegas's cousin, Emilsen Manyoma Mosquera, as a leader of a victim's advocacy organization, CONPAZ, who campaigned against paramilitary drug trafficking and governmental corruption in Buenaventura, Colombia. The article suggests that Mosquera and Ibarra-Rodallegas's cousin, Joe Javier Rodallega, were killed by a neo-paramilitary drug-trafficking group called Los Urabeños.

## B. The Immigration Judge's Decision

The IJ denied Ibarra-Rodallegas's claims in an oral ruling on October 30, 2023. As to Ibarra-Rodallegas's petition for asylum and withholding of removal, the IJ found Ibarra-Rodallegas not credible due to internal inconsistencies in her testimony and her shifting testimony on certain issues, like whether there was a police presence in Neuvo Laredo. The IJ also ruled on

the merits of Ibarra-Rodallegas's claims. The IJ denied her claims based on her membership in the PSG of victims of domestic violence, in part because Ibarra-Rodallegas failed to demonstrate that the Mexican government was "unable or unwilling" to control her abuser, Herrera. *Id.* at Page ID #51. The IJ denied Ibarra-Rodallegas's claims based on persecution in Colombia because it concluded that she was "firmly resettled" in Mexico. *Id.* And the IJ denied protection under the CAT because Ibarra-Rodallegas did not demonstrate that "she would be targeted by private actors for torture and that the government[s of Mexico or Colombia] would consent to such torture." *Id.* at Page ID #52. The IJ ordered Ibarra-Rodallegas and N.A. removed to Colombia, or in the alternative, to Mexico.

### C. The Board's Decision

Ibarra-Rodallegas sought review of the IJ's decision by the BIA. The BIA affirmed the IJ in a written decision. It concluded that the IJ's "adverse credibility finding [wa]s supported by specific reasons and is not clearly erroneous," and adopted the adverse credibility finding for the reasons stated in the IJ's oral ruling, denying Ibarra-Rodallegas's claims for asylum and withholding of removal. *Id.* at Page ID #4. The BIA also "agree[d] with the [IJ]" that Ibarra-Rodallegas could not succeed on her CAT claim because she "ha[d] not established that the Mexican or Colombian governments would more likely than not acquiesce to any alleged future torture." *Id.* It therefore affirmed the IJ's denial of Ibarra-Rodallegas's request for protection under the CAT.

## II. DISCUSSION

### A. Standard of Review

This Court has jurisdiction to review the BIA's decision affirming the IJ's denial of asylum, withholding of removal, and relief under the CAT. *Singh v. Ashcroft*, 398 F.3d 396, 400 (6th Cir.

2005). "When the BIA adopts the IJ's reasoning and supplements the IJ's opinion, that opinion, as supplemented by the BIA, becomes the basis for review." *Slyusar v. Holder*, 740 F.3d 1068, 1072 (6th Cir. 2014) (internal quotation marks omitted). We "directly review[] the decision of the IJ while considering the additional comment[s] made by the BIA." *Id.* (internal quotation marks omitted). In this case, we review the IJ's adverse credibility determination and other factual findings, because the BIA adopted the findings wholesale.

We review "legal conclusions made by the BIA *de novo*" and administrative factual findings and credibility determinations for substantial evidence. *Id.* Under the deferential substantial evidence standard, "we uphold a BIA determination as long as it is supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Id.* (internal quotation marks omitted). Factual findings and credibility determinations are therefore "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." *Id.* (internal quotation marks omitted). "That this Court could conceivably make a contrary conclusion is not enough to justify reversal of the [immigration court's] decision" under the substantial evidence standard; "compulsion is required." *Id.* at 1073.

**B. Analysis**

In Ibarra-Rodallegas's case, the IJ denied relief on her applications for asylum and withholding of removal, and the BIA upheld the decision, based on the IJ's finding that Ibarra-Rodallegas did not testify credibly. On appeal, Ibarra-Rodallegas argues that the adverse credibility finding was not supported by substantial evidence, and that the IJ erred in finding her not credible.

We conclude that the IJ did not err in denying Ibarra-Rodallegas relief upon finding that she was not credible. And all of Ibarra-Rodallegas's claims—for asylum, withholding of removal, and relief under the CAT—rest on the credibility of her testimony.

"[A]n IJ assessing the credibility of a petitioner seeking [asylum,] withholding of removal[,] and CAT protection considers the totality of the circumstances." *Kolov v. Garland*, 78 F. 4th 911, 920 (6th Cir. 2023). Credibility determinations take into account "all relevant factors." 8 U.S.C. § 1158(b)(1)(B)(iii). Such factors include the internal consistency of the applicant's statements, the "consistency of such statements with other evidence of record," and "any inaccuracies or falsehoods in such statements." *Id.* "An adverse credibility determination is fatal to claims for asylum and relief from removal, preventing such claims from being considered on their merits." *Slyusar*, 740 F.3d at 1072. This is true regardless of whether an inaccuracy or inconsistency goes to the "heart of an applicant's claim." *Id.* Under the REAL ID Act, "any inaccuracies or falsehoods in [an applicant's] statements" can defeat an asylum claim, "without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim, or any other relevant factor." *Id.* (quoting 8 U.S.C. § 1158(b)(1)(B)(iii)). Further, "[t]he same credibility standard applies to claims for asylum, withholding of removal, and for relief under the torture convention," meaning that the IJ's adverse credibility determination, if upheld, disposes of all three of Ibarra-Rodallegas's claims for relief. *Id.* at 1072, 1074 (internal quotation marks omitted).

An IJ "must state 'specific reasons' justifying an adverse credibility determination." *Al Ameri v. Holder*, 361 F. App'x 641, 644 (6th Cir. 2010) (quoting *Yu Lin v. Mukasey*, 293 F. App'x 404, 407 (6th Cir. 2008)). But "'[s]o long as one of the identified grounds [for the adverse

11

credibility finding] is supported by substantial evidence,' we must accept the IJ's determination." *Id.* (quoting *Yang Lin v. Holder*, 320 F. App'x 428, 432 (6th Cir. 2009)).

In this case, the IJ based her adverse credibility findings, in part, on the fact that Ibarra-Rodallegas's testimony concerning her political involvement in Colombia "was exaggerated and contradicted by the documents she submitted." AR, R. 5-2, Page ID #50. We agree with the IJ that Ibarra-Rodallegas's testimony about her political activity was internally inconsistent and inconsistent with other evidence in the record. This provides ample reason to uphold the IJ's adverse credibility determination as supported by substantial evidence. *See Slyusar*, 740 F.3d at 1073.

Ibarra-Rodallegas testified that, at the time of her removal hearing in 2023, she was active in Colombian politics: She was "still actively" a member of the Council and she "continue[d] working with them" since 2002. AR at Page ID # 139–140; 158–161. But this testimony is contradicted by the letter Ibarra-Rodallegas submitted, which misstated her residence, and also contradicted by her lack of knowledge of a crucial peace deal between the government and FARC. As discussed, the letter Ibarra-Rodallegas submitted specifically to establish her membership in the Council and participation in political activism erroneously lists her residence as Ceibito, Colombia, a town she has not lived in since 2017, when she returned to Colombia temporarily. This mistake suggests that the Council was at least unaware of Ibarra-Rodallegas's whereabouts between 2017 and 2023, and therefore contradicts her testimony that she remained an active member of the group during those years. The contradiction therefore supports the IJ's determination that Ibarra-Rodallegas's claim of continued political involvement was exaggerated.

On appeal, Ibarra-Rodallegas argues that the IJ's credibility determination, insofar as it was based on the mistake in the letter, was erroneous, because she supplied a "reasonable and plausible"

12

explanation at her removal hearing that the letter intended to indicate that "she is from that community but not necessarily currently living there at the time the letter was issued." Pet'rs' Br., ECF No. 12, 26. But this explanation does not compel us to make the conclusion, contrary to that of the IJ, that Ibarra-Rodallegas's testimony on her political involvement was credible. *See Slyusar*, 740 F.3d at 1072. The brief letter from the Council supports that Ibarra-Rodallegas is a nominal member of the organization, but it does not suggest that she is continuously involved with political activism in Colombia. And other inconsistencies in Ibarra-Rodallegas's testimony further support the IJ's conclusion that her testimony on her continued political involvement was not credible. Specifically, Ibarra-Rodallegas had no knowledge of a crucial peace deal between the Colombian government and FARC, which would have been of interest to her if she was still involved in Colombian politics and fearful of FARC. Ibarra-Rodallegas submitted a 2022 report on country conditions in Colombia that states FARC and the Colombian government brokered the peace accord in 2016 and had engaged in a peace process for six years. Although Ibarra-Rodallegas resided in Mexico in 2016, she returned to Colombia periodically between 2017 and 2019. It is implausible that, had she remained active in a humanitarian group during this time, she would have been unaware of the peace accord.

Relatedly, Ibarra-Rodallegas testified that her cousin, Joe Rodallega, and his partner, Emilsen Manyoma Mosquera, were murdered by FARC because of their membership in the Council. But this testimony is inconsistent with an article Ibarra-Rodallegas submitted describing the murders. Contradicting Ibarra-Rodallegas's testimony, the article describes Mosquera as a leader in a different humanitarian group. And though the article corroborates that Rodallega and Mosquera were likely murdered due to their involvement in community organizing, it attributes their murder to a right-wing group of paramilitary drug traffickers, not the left-wing rebels FARC,

as Ibarra-Rodallegas testified. Therefore, the article both renders Ibarra-Rodallegas's testimony on her cousins' murder inconsistent with the record and undermines her testimony that she was threatened by FARC in relation to the murders. On this record, there is substantial evidence to support the IJ's adverse credibility finding, based on the judge's conclusions that Ibarra-Rodallegas's testimony as to her political involvement in Colombia was "suspect," "exaggerated," and "contradicted by the documents she submitted." AR, R. 5-2, Page ID #50.

Ibarra-Rodallegas does not supply any evidence to contradict this conclusion. So, though "we may not have viewed [Ibarra-Rodallegas's] discrepancies in testimony . . . the same way" as the IJ, where "no evidence has been presented that compels a different ruling,'" we are bound by the adverse credibility determinations of the IJ as upheld by the BIA. *Thayaparan v. Sessions*, 688 F. App'x 359, 364 (6th Cir. 2017) (quoting *Slyusar*, 740 F.3d at 1073).

The IJ additionally found Ibarra-Rodallegas's testimony not credible because she "changed her answers when confronted with problematic testimony." AR, R. 5-2, Page ID #50. Specifically, when cross-examined on why she did not report Herrera's abusive behavior to police in Nuevo Laredo, Ibarra-Rodallegas first answered that "there were no police in town," but "[w]hen asked if she had proof that there were no police, she changed her answer and stated that maybe there were police but they wouldn't pay attention to her." *Id.* On appeal, Ibarra-Rodallegas acknowledges that she gave different answers on whether police were present in Neuvo Laredo but explains that her changing testimony reflected her consistent belief that the police in Mexico are corrupt and would not pay attention to domestic violence cases. This argument does not compel reversal of the IJ's adverse credibility determination. The IJ "may base a credibility determination on the demeanor, candor, or responsiveness of the applicant or witness" as well as "the internal consistency" of the applicant's statements. 8 U.S.C. § 1158(b)(1)(B)(iii). Therefore, Ibarra-

Rodallegas's shifting answers provide substantial evidence for the IJ's adverse credibility determination. We may tend to agree with Ibarra-Rodallegas that her answers consistently reflected a theoretical, rather than practical, absence of police in Neuvo Laredo, Mexico, and found no contradiction had we been in the IJ's position. But that we could come to "a contrary conclusion is not enough to justify reversal of the IJ's decision; compulsion is required." *Slyusar*, 740 F.3d at 1073. And Ibarra-Rodallegas's explanation does not compel this Court to reverse the IJ's adverse credibility finding. Therefore, we again conclude that we are bound by the adverse credibility determination of the IJ, as upheld by the BIA.

Having upheld the IJ's adverse credibility determination on several grounds, we conclude that the IJ's adverse credibility determination is fatal to Ibarra-Rodallegas's claims for asylum, withholding of removal, and relief under the CAT. "The same credibility standard applies to claims for asylum, withholding of removal, and for relief under the torture convention." *Id.* at 1074 (internal quotation marks omitted). Where there is an adverse credibility finding supported by substantial evidence, as in this case, the determination "prevents any reliance on Petitioner's testimony as evidence for his claims of asylum, withholding of removal, and CAT protection." *Thayaparan*, 688 F. App'x at 365 (6th Cir. 2017). Ibarra-Rodallegas's claims for asylum and withholding of removal are premised on her past persecution and fear of future persecution due to her race, nationality, gender, domestic violence victimization and political opinion. Her claim for CAT relief is premised on her "fears that the government would acquiesce to the torture committed by FARC in Columbia and her ex-partner in Mexico." Pet'r's Br., ECF No. 12, 10. These claims "depended almost entirely on [Ibarra-Rodallegas's] own testimony." *Thayaparan*, 688 F. App'x at 365. Thus, Ibarra-Rodallegas can only succeed on her claims if she argues that her other evidence, such as the statements she submitted, was "independently sufficient" to carry her burden

15

of proof. *Id.* She makes no such argument. So, the IJ's adverse credibility determination necessarily disposes of Ibarra-Rodallegas's claims. *See Slyusar*, 740 F.3d at 1073–74. Accordingly, we need not reach the merits of Ibarra-Rodallegas's claims, and we deny the petition for review.

### III.     CONCLUSION

For the reasons set forth above, this Court **DENIES** Ibarra-Rodallegas's petition for review of the Board of Immigration Appeals' decision.